[S. F. No. 2894.    Department One.—December 1, 1904.]

## J. W. MASON, Respondent, v. ISIDORE LIEVRE, Appellant.

SALE OF STOCK—ACTION FOR PURCHASE MONEY—OFFER AND ACCEPTANCE —DIRECTION FOR DRAFT—SETTING APART OF STOCK—DELIVERY.—An action may be maintained for the purchase price of certain shares of the stock of a corporation sold by plaintiff to the defendant, where it appears that, as the result of correspondence, there was a complete offer and acceptance for the purchase and sale thereof, with direction to the plaintiff to draw upon the defendant for the purchase money, without direction as to delivery, and that the plaintiff complied with such direction and set apart the stock for the use of the defendant, and requested information as to the mode of its issuance, and tendered the stock thereafter within a reasonable time. In such case there was a completed sale of the stock, as to which an immediate delivery was not essential.

ID.—REVOCATION BEFORE DELIVERY—ABSENCE OF AGREEMENT AS TO TIME. —There having been no agreement as to the time of delivery of the stock, and the contract of sale having been complete before delivery, the contract bound both parties, and the defendant could not revoke the contract before actual delivery and tender of the shares within a reasonable time, on the ground that they did not accompany the draft.

ID.—TRANSFER OF STOCK—IDENTIFIED SHARES—PASSAGE OF TITLE.— Where the vendor had complied with what was required on his part, and it only remained for the vendee to designate as to the mode of transfer of the stock, which was ready for immediate delivery, and it is evident that if the stock had been delivered

immediately to the vendee in San Francisco, it must have been returned to Honolulu for transfer on the books, if desired, the request for an intimation of such desire did not affect the passage of the title to the identified shares of stock sold, which were set apart by the vendor to the use of the vendee.

ID.—SUFFICIENCY OF FINDINGS—PROBATIVE AND ULTIMATE FACTS—CONCLUSIONS OF LAW.—Where the findings are in part of probative facts and in part of ultimate facts, and findings of ultimate facts appear in the conclusions of law, they may all be considered in determining whether they are supported by sufficient evidence, and are sufficiently responsive to the issue made by the pleadings, and support the judgment.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial. John Hunt, Judge.

The facts are stated in the opinion.

M. S. Eisner, and Reinstein & Eisner, for Appellant.

Oliver Ellsworth, for Respondent.

CHIPMAN, C.—Plaintiff sues to recover the sum of $1,040, the alleged purchase price of five hundred shares of the Olaa Sugar Company stock, which he claims to have sold to defendant. The cause was tried by the court without a jury, and plaintiff had the judgment. The appeal is from the judgment and from the order denying defendant's motion for a new trial.

The alleged contract of sale is found in certain letters passing between plaintiff and defendant which, with some explanatory circumstances and facts, constitute the evidence in the case. Plaintiff resided at Hilo, Hawaiian Islands, and defendant resided at San Francisco. Both were merchants and had had some previous dealings in sugar stock on an occasion when plaintiff was in San Francisco. Plaintiff testified that "the particular transaction involved in this suit was carried on altogether through correspondence." On May 19, 1899, plaintiff wrote defendant the following letter:—

"HILO, H. I., May 19, 1899.
"Mr. ISIDORE LIEVRE, 215 Market Street, San Francisco, Cal.
"My Dear Sir:—I have not yet had time to write you fully as I would like, and to-day being mail-day, you can readily

understand my having so much to attend to after a long absence, and will not be able to write you about anything by this mail, except the Sugar Company.

"Before this stock was issued in Honolulu on last Monday, I saw it selling at $1.00 premium, which was 50 per cent on the amount paid in. I was very sorry that I could not do better by you than I did, consequently feel disposed to assist you in any way that I can. On my arrival at Hilo, I found that the subscribers here had not paid up their assessments for the allotment at Hilo, and that it has been subscribed for three times over, but we are compelled to send the assessments down by this steamer at the latest, and already I find that some of the subscribers are not able to pay up for as much as they subscribed for, and we have no discretion but to have them pay up or cut off their subscription, so there will be some stock left unpaid for. In which event, although it is at a premium, under the circumstances as above described, I will be willing to let you have what I can of it under exactly the same conditions as I took it over, for I shall pay up the assessment of ten per cent and the stamp duty myself to-day for whatever may be left over, and will allot you some of it if you write me you desire it. The only additional cost to you will be another four cents per share additional for the transfer. In other words, you will pay ten per cent on the par value, and eight cents per share stamp duty, which includes the stamp duty I paid, and the one that will be on your stock. Let me hear from you by next mail, as I cannot hold it very long for you, as there are many people here now who want to subscribe, but who have not their names on the list, and they will be glad enough to pay even a premium on the stock.                    (Signed) J. W. MASON."

The par value of the stock was twenty dollars per share. On May 31, 1899, defendant wrote plaintiff in reply as follows:—

"SAN FRANCISCO, May 31, '99.
"J. W. MASON, Esq., Hilo, H. I.

"Dear Sir:—Confirming my letter of even date, I am now in receipt of your favor of the 19th inst., and would state that I appreciate your kindness in the matter. I will take up to five hundred shares of the assessable stock on the basis mentioned by you, namely, payment of first assessment plus eight-

cents stamp duty per share. As to the amount of same, you can draw on me at one day's sight for the amount.

"Respectfully yours,                    ISIDORE LIEVRE."

Subsequently plaintiff received a letter from defendant dated June 13, 1899, reading as follows: "I confirm my previous letter concerning the amount of assessable stock I am willing to take, namely, five hundred shares (500). I would like to ask you to kindly give me information as to what the Olaa Sugar Company is doing."

On June 21, 1899, plaintiff wrote defendant in reply to his letter of May 31st as follows:—

"June 21, 1899.

"Mr. ISIDORE LIEVRE, 215 Market Street, San Francisco, Cal.

"Dear Sir:—I have your two favors of the 31st ult., which seem to have been delayed in some way, and note the inclosed copy of your letters to Messrs. Bishop & Co. and B. F. Dillingham.

"I note that you will take up to five hundred shares of assessable stock on the basis mentioned in my letter of the 19th of May, so I am making draft on you as per your request, through our agents, Messrs. Alexander & Baldwin, at one day's sight, for the sum of $1,040.00, which is the first assessment, and eight cents per share stamp duty. Write me how you want the stock issued, and I will have it sent to you by the company.                    (Signed) J. W. MASON."

No other letters were written by plaintiff in reply to the above letters of defendant. It takes about nine or ten days, as testified, for a letter to go from San Francisco to Hilo; delays of three or four days sometimes occur at Honolulu.

Plaintiff testified that immediately upon receiving defendant's letter of May 31st (which was about June 13th) he set aside five hundred shares of the sugar company stock for defendant, and on June 21st drew on defendant for the amount mentioned in the correspondence. His agents, Alexander & Baldwin, through whom he drew, were at Honolulu. The draft was presented about July 5th and payment refused, but for what reason was not stated at the time of refusal, so far as appears. Plaintiff testified: "I allotted and set aside that amount of stock to him. I had a certain amount of stock that

I had subscribed for, as Mason, trustee, for the benefit of my San Francisco friends, and Mr. Lievre was one of them, and others I can name to whom I wrote just such letters. I heard from Mr. Lievre as to how many he would take, and I set aside that amount for him. I awaited a reply from him as to how I should have the stock made out; that is the only reason I did not have that [referring to the certificate of stock] sent to him, attached to the draft." Further explaining this omission to send the certificate with the draft, he testified that it was "because he did not tell me how it was to be allotted. In my previous transactions with him he had taken stock in their names"—presumably other persons. At the time plaintiff received defendant's letter of May 31st, he held over four thousand shares, some in his own name and others in his name as trustee. On July 3, 1899, defendant wrote plaintiff as follows: "I hereby revoke my offer to take five hundred shares of assessable stock. I have this day written to my agent at Honolulu, J. C. Cohen, full instructions as to same, and if you go to Honolulu you can interview him, and he will fully explain the matter to you, or if you do not go, he will communicate with you direct as to the same."

After defendant had refused to accept the first draft, he wrote plaintiff on July 8th in which he stated that the stock was for a friend who would have taken it, notwithstanding it had fallen off in value, if it had been attached to the draft, "for," defendant wrote, "I would have been in a position to show him that the order for cancellation did not reach in time, and that in the mean time the stock had been delivered; and he would be bound to pay for same."

The court found on sufficient evidence that defendant's letter of July 3d "was mailed and received by plaintiff subsequent to the writing, mailing, and receipt of the aforesaid letters of May 19th and May 31, 1899 (plaintiff's letter and defendant's reply), and subsequently to the writing and mailing of the letter of June 21, 1899" (plaintiff's letter drawing on defendant). After receiving this July 3d letter plaintiff wrote his agents at their Honolulu office July 20th, sending them five hundred shares of the sugar company stock, with directions to have it reissued in the name of defendant, and this certificate bearing the date July 25th, accompanied by a second draft on defendant for the amount first drawn for, was

sent forward to the San Francisco office of Alexander & Baldwin, and there is evidence that upon its being received the draft with the certificate attached was presented to defendant and acceptance refused.

Upon these facts, some of which are specifically found, the court, as conclusions of law, found that plaintiff's letter of May 19th was an offer to sell five hundred shares of the stock in question, at the price stated therein; that defendant's letter of May 31st was an acceptance of the offer and an agreement to buy this number of shares at said price; that by plaintiff's letter of June 21st he only notified defendant that he (plaintiff) had made a draft on defendant for the purchase price; "that the writing, mailing and receipt of the said letters of May 19th, May 31st, and June 21st constituted a written executed contract of sale by plaintiff to defendant" of said shares for the sum named, and "that on the presentation of plaintiff's said draft on defendant . . . and the refusal by defendant to accept the said draft, the said sum of $1,040 became thereupon due and owing, by defendant to plaintiff"; and, as a further conclusion of law, that plaintiff is entitled to judgment against defendant for the sum named with interest and costs of suit.

Defendant claims that plaintiff's letter of May 19th was not a sufficient offer to sell five hundred or any other number of shares of stock, owing to its indefiniteness, and that the only definite offer in the entire transaction was defendant's letter of May 31st, which could be, and was, withdrawn before the plaintiff legally accepted it. By legal acceptance defendant means and insists that there must have been delivery of the shares at the time the first draft was presented for acceptance, and as it is conceded that the shares were not then tendered, he had a right to refuse acceptance. Furthermore, that as defendant withdrew his offer, of which plaintiff had notice, before sending his second draft, accompanied by the shares, the transaction was at an end, and he rightly refused acceptance of the shares.

It may be conceded that the letter of May 19th alone lacks in some respects the element of distinctness and certainty essential to a complete offer to sell. But whatever of uncertainty there may be on the face of this letter as to the company referred to or as to the number of shares offered, its meaning

was well understood by defendant, as shown by his letter of May 31st, in which he definitely offered to take five hundred shares, and by plaintiff's letter of June 21st in reply. By these several letters the minds of the parties were brought into perfect agreement. It is noticeable, and defendant comments on the fact, that the name of the company is not mentioned in the May 19th letter. This is true of defendant's letter of May 31st and also plaintiff's letter of June 21st, but defendant does not deny, nor can it be doubted, that both parties knew what stock was referred to, for in defendant's letter confirming his letter of May 31st he asks for ''information as to what Olaa Sugar Company is doing.''

It seems to us too obvious to call for discussion that when defendant made his offer to take five hundred shares in response to plaintiff's letter, also authorizing plaintiff to draw on him for the money, and plaintiff thereupon advised defendant that he had drawn on him as requested by defendant, an executed written contract resulted from the correspondence. If the parties had been strangers to each other defendant might with greater reason claim that the stock should have accompanied the draft, and might also have assumed that the shares would come with the draft. On the other hand, as friends, between whom at least one similar deal had occurred, as well as some others, plaintiff might well have assumed that defendant did not expect the stock to be sent with the draft, especially as defendant did not request it to be so sent. There must have been some understanding outside the letters, or defendant would not have known to what plaintiff referred to in his letter of May 19th; and this would seem quite probable from the fact that plaintiff in writing defendant desired to know how he wanted the stock issued. Plaintiff had paid for the stock just what he was getting for it, although it was then worth a premium; there was no profit to him in the transaction, but it was rather a matter of accommodation to defendant. We do not think that plaintiff failed to send the stock because he intended to reserve, as defendant urges, the *jus disponendi,* or that the transaction had that effect. In our opinion, plaintiff's letter of June 21st was such a closing of the sale as to have given defendant a right of action for the stock. Indeed, as we understand defendant's position, he does not rely on his retraction of July 3d so much as on the fact

that the stock should in any event have been tendered with the presentation of the draft. Undoubtedly, this would be true if defendant had so directed, for it would then have been one of the express provisions of the contract. But he did not so direct, and the question arises whether it was necessary to a completed sale. Apart from the consideration that, in view of all the facts, plaintiff was not required to send the stock with his draft, as might under some circumstances have been the case, we do not think delivery of the shares was essential to the completed sale. This was not the ordinary sale of goods for cash or "cash on delivery" in which payment of the purchase price and the delivery of the goods are conditions precedent to vesting title, nor does it come within the class of cases known as a "trade offer," and may readily be distinguished from *Hilmer* v. *Hills,* 138 Cal. 134, cited by defendant. Such is the rule generally as to executory contracts, but there was here no condition that the price should be paid before delivery; on the contrary, plaintiff set aside the stock to defendant's use on receipt of his letter and drew on him precisely as directed. It was then too late for either party to retract; the sale was complete and the contract executed. The intention to sell and the intention to buy are both clear and unmistakable from the written expressions of the parties, and whatever significance might attach to the acts of payment and delivery would be in the nature of evidence, and not as of the essence of the contract. But if there remained some doubt on the question of intent from evidence conflicting in its nature, which we do not think there was, the finding of the court must stand. Even where there has been a manifestation of intention, Mr. Benjamin states the rule to be, that "the presumption of law is that the contract is an actual sale, if the specific thing is agreed on, and it is ready for immediate delivery." (Benjamin on Sales, 7th ed., sec. 311.) Where the goods have not been specified, or if, when specified, something remains to be done to them by the vendor, either to put them into deliverable shape, or to ascertain the price, the contract is executory. In this latter case, it is presumed that the parties intended to make the transfer dependent upon the performance of the thing yet to be done, as a condition precedent. (Ibid.) "But," it is added, "of course these presumptions yield to proof of a contrary intent." (Ibid.)

Here there was nothing remaining to be done by the vendor. He had shares in his own name and as trustee, which could have been delivered. The thing remaining to be done was for the defendant to designate how he wanted the shares issued. The cases in which the contracts were held to be incomplete because something remained to be done by the seller before delivery could be made according to the contract, "are those where that which remains to be done is something in order to the ascertainment of the price, or to the identification of the property sold, or where the contract is executory, as where the article sold has yet to be manufactured, such a contract being more strictly an agreement to sell, than a contract of sale." (*Tyson* v. *Wells,* 2 Cal. 122.)

It was said in *Hatch* v. *Oil Co.,* 100 U. S. 124: "Standard authorities also show that where there is no manifestation of intention, except what arises from the terms of the sale, the presumption is, if the thing to be sold is specified and it is ready for the immediate delivery, that the contract is an actual sale, unless there is something in the subject-matter or attendant circumstances to indicate a different intention."

Mr. Cook states the law thus: "Generally a sale of stock is attended with an immediate delivery of the certificate therefor, or it is agreed that the certificate shall be delivered at some specified time in the future. If, however, the vendor offers to sell his stock and the vendee accepts the offer, the contract is complete and binds both parties, although nothing has been said as to the time when the certificate of stock shall be delivered. The law implies that the contract will be performed by a delivery of the certificates immediately or within a reasonable time and either party may insist upon carrying out the contract." (Cook on Stock and Stockholders, sec. 334.)

The office of the sugar company was Honolulu, and had plaintiff sent defendant the shares with the draft it would have been necessary for defendant to return them to Honolulu for reissue in his name, if he had desired them to so issue. The rule of our code is, that "The title to personal property sold or exchanged passes to the buyer whenever the parties agree upon a present transfer, and the thing itself is identified, whether it is separated from other things or not." (Civ. Code,

sec. 1140.)    If title passes in such a case, it cannot be that delivery of the thing, simultaneously with payment, is necessarily of the essence of the transfer.    (See the subject discussed somewhat in *Lassing* v. *James,* 107 Cal. 348.)

It is contended that the findings are not responsive to the issues; that there is a failure to find on material issues; and that the ultimate facts pleaded in the complaint do not necessarily follow from the probative facts found.

After what has been said as to the transaction and the liability under what is undisputedly the contract between the parties, we do not deem it necessary to examine at length the objections to the character of the findings or as to whether they conform to the issues.    They are findings in part of probative facts and in part ultimate facts, and the conclusions of law are in part more findings of ultimate facts than conclusions of law.    We may look to all these to determine whether they are supported by sufficient evidence and are sufficiently responsive to the issues made by the pleadings and support the judgment.

We have examined appellant's points on the objections raised and his argument in support thereof and respondent's reply thereto, and we find no prejudicial error in respect of any of the objections made.

It is advised that the judgment and order be affirmed.

Gray, C., and Cooper, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are affirmed.

Van Dyke, J., Angellotti, J., Shaw, J.