# CHARLESTON.

## LIPSCOMB'S ADM'R *v.* CONDON.

Submitted September 15, 1904—Decided December 6, 1904.

1. STOCK.—*Intangible Property.*
   By the common law, shares of stock in a corporation, being in the nature of choses in action, intangible property incapable of manual seizure, are not subject to execution or attachment. They are by statute. (p. 418).

2. LIEN OF ATTACHMENT OR EXECUTION.—*Corporation Stock.*
   Section 9 of chapter 106, Code of 1899, giving the plaintiff in an attachment proceeding a lien on the personal property of the debtor from the time of the levying of the attachment, or serving a copy thereof on the garnishee, on all the personal property, choses in action and other securities of the defendant in the hands of the garnishee, and, on any real estate of the debtor levied on by virtue thereof, from the suing out of the same, includes shares of corporation stock in the terms "personal property, choses in action and other securities." (p. 419).

3. CORPORATION STOCK.—*Incorporeal Property.*
   Such shares are personal estate, and a species of incorporeal property. (p. 419).

4. GARNISHMENT.
   In his proceeding by the creditor of a shareholder to subject his shares to the payment of his debt, the corporation in which the shares are held should be made the garnishee. (p. 420).

5. CORPORATION STOCK.—*Evidence.*
   A certificate of stock is not the stock itself, but is evidence of its existence and ownership. (p. 420).

6. CORPORATION STOCK.—*Muniment of Title.*
   Though, when issued, such certificate is a muniment of title, it is not essential to the existence of the property represented by it. (p. 420).

7.   STOCK.—*Sale of Stock—Parol Assignment.*

A Certificate is not necessary to a sale of shares. The ben-- eficial interest in them is assignable by parol, the ownershiip passing immediately on consummation of the sale, by force of the contract, as in the case of ordinary choses in action, and not by operation of law.   (p. 421).

8.   STOCK.—*Certificate.—Sale of Stocks.*

A sale of shares for which no certificate has been issued may be evidenced by an informal written instrument, executed and delivered by the transferrer to the transferee, without a power of attorney entitling the latter to have the same transferred on the books of the company.   (p. 422).

9.   STOCK.—*Sale.—Certificate.*

In this State, a shareholder may, upon his demand, obtain a certificate of his shares, but, unless demanded by him, it need not be issued, and he may freely transfer the shares without it if they are fully paid up, or security for the balance due on them, satisfactory to the board of directors, be given.   (p. 432).

10.   STOCK.—*Statute Construed.*

Section 21 of chapter 53 of the Code of 1899, requiring corporations to keep transfer books and the shares to be assigned therein, is intended for the protection and convenience of the corporation and its shareholders.   (p. 433).

11.   CORPORATION RECORDS.—*Private Property.*

The books and papers of a private corporation under the laws of this State are not public, but private, records and documents.   (p. 433).

12.   STOCK.—*Attaching Creditor.—Assignee.*

An unregistered transfer of shares of corporation stock, for which no certificate has been issued, if made for a valuable consideration and without fraud, vests in the transferee a title to the shares superior to the claim of a subsequent attaching creditor of the transferrer.   (p. 436).

13.   EXECUTION.—*Attachment.—Lien.*

In the absence of fraud and statutory regulations, a creditor proceeding by execution or attachment, only obtains such rights in the property seized as his debtor had at the time of the seizure.   .(p. 426).

14.   CREDITOR.—*Chose in Action.*

The rights of a creditor, respecting shares of corporation stock for which certificates have not been issued, alleged to be the property of his debtor, are the same as in the case of an ordinary chose in action.   (p. 437).

15. PETITION.—*Issue.—Jury Trial.*

When, under the provisions of section 23 of chapter 106 of the Code, a petition is filed in a suit in equity founded upon an attachment, setting up title by purchase, and the plaintiff in the cause relies upon fraud in the alleged purchase to defeat the claim of title so set up, the trial of the issue must be upon the petition without any other pleading, and by jury, unless trial by jury is waived. (p. 439).

16. EQUITY.—*Jury Trial.—Issue Out of Chancery.*

In such case, it is reversible error to hear and determine the issue upon the petition, and answer thereto and depositions of witnesses, according to the rules and principles governing courts of equity. (p. 443).

17. JURY TRIAL.—*Waiver.—Record.*

Waiver of the right of trial by jury must be by consent entered of record. It cannot be merely inferred from the fact that the court tried the case without objection. (p. 445).

Appeal from Circuit Court, Tucker County.

Bill by Lipscomb's administrator against Levi Z. Condon and Albert N. Horner. Decree for plaintiff, and defendants appeal.

*Reversed.*

W. B. MAXWELL and C. W. DAILEY, for appellants.

F. M. REYNOLDS and J. P. SCOTT, for appellee.

POFFENBARGER, PRESIDENT:

This is a suit in equity against a non-resident defendant, to subject to the payment of a debt, amounting to five thousand dollars and interest, by process of attachment and garnishment, certain shares of stock in a corporation which, the bill alleges, are the property of the defendant. The case presents a number of questions which seem never to have been passed upon by this Court.

In the absence of any statute upon the subject, shares of stock in a corporation are not subject to execution. Cook on Cor., section 480; Clark Cor. 1147. By that law, intangible property incapable of manual seizure and delivery cannot be taken on execution. Attachment being a purely statutory remedy, reaches only such property as is made subject to it by the statute. Hence, if the statutes, governing the remedy by at-

tachment, do not make shares liable under it, it is clear that they cannot be subjected to the payment of debts by such proceeding. Drake Attach. section 244; *Haley* v. *Reid,* 16 Ga. 437; *Foster* v. *Potter,* 37 Mo. 525; *Howe* v. *Starkweather,* 17 Mass. 240.

By section 20 of chapter 53 of the Code of 1899, it is declared that such shares shall be deemed personal estate.. Section 9 of chapter 106 gives the plaintiff in an attachment proceeding a lien, from the time of the levying of his atachment, or serving a copy thereof, as provided in that chapter, "upon the personal property, choses in action, and other securities of the defendant against whom the claim is, in the hands of, or due from any garnishee, on whom it is so served." By these provisions, the legislature has expressly made choses in action liable to garnishment, and shares of corporate stock are almost universally held by the courts to be property of that nature. Thomp. Com. Cor., sections 1070, 2587, 4571; Cook Cor. section 123; Clark Cor. section 377. If there were no adjudications upon the subject, there would be no reason to. hestitate in saying that shares of stock are subject to attachment, under these statutes. Although this Court has not construed them, similar statutes have been passed upon in many of the States. In *Railroad Co.* v. *Payne,* 29 Grat. 502, shares in a railroad company were held liable under a statute which made the attachment a lien upon all the "estate" of the debtor. In delivering the opinion of the court, Moncure, President, said such shares were plainly within the letter, as well as the spirit, of the law. In *Bank* v. *Byram,* 131 Ill. 92, it was held that the words "rights and effects" of the debtor in the general attachment law were broad enough to cover shares of stock. In *Curtis* v. *Steever,* 36 N. J. L., 304, the words "rights and credits" in the general attachment law were sufficient. It is now well settled by the authorities that, in the absence of any statutory provision to the contrary, shares of stock, although incorporeal in their nature, are personal property. Clark Cor. 1142, 1143. As our statute makes them personal property and subjects apparently all forms of property to the process of attachment, by giving a lien on the real estate, personal property and choses in action and other securities of the debtor, it would be very difficult to find a plausible technical ground upon which to except them, and utterly impossible to say, in view of the vast amount of money and prop-

erty represented by corporation stock and the extent of its use· for purposes of credit, that the legislature did not intend that . it should be subject to the attachment laws.

Nor can there be any doubt that, in the matter of procedure, the corporation itself may be made the garnishee. · Whatever· interest the shareholder has, is in the custody and control of the corporation. A share of . the capital stock of a corporation is the interest or right which the owner has in the management of· the corporation, in its surplus profits, and, upon dissolution,. in all of its assets remaining after the payment of its debts. Clark Cor. 1141. The certificate of stock representing the share of the owner, may be in the hands of some person other· than the debtor or the corporation, but the certificate is not the share itself. For most purposes, it is not regarded as property, but only as evidence of the existence and ownership of the· shares named and described in it. 10 Cyc. 588. Where the proceeding to subject stock by attachment is under the general attachment laws,. the corporation is made the garnishee. *Railroad Co.* v. *Payne,* 29 Grat. 502. Special statutes usually make the corporation the garnishee. Drake Attach. section 259.

In this case, the stock, against which the proceeding is, stands on the books of the company in the name of the debtor, but is claimed by a third party under an alleged purchase thereof from the debtor, made long before. the order of attachment was served upon the company, in fact, years before this suit was brought. Is the lien of the attachment superior to the title of the purchaser? The assignment of the shares was not made by delivery of share certificates, but by a mere written assignment of the shareholder to the purchaser, specifying the number of shares. It does not appear that any certificate had ever been issued, nor that any demand for the transfer of the stock from the seller to the buyer on the books of the company had ever been made. The circuit court found and held that, for the purposes· of this suit, the stock was the property of the debtor, and decreed it to be sold, but, whether it did so upon the ground that the sale was frudulent, or that an unregistered transfer of the stock is not good as against an attaching creditor, does not appear.

"The decided weight of authority holds that he who purchases for a valuable consideration a certificate of stock is pro-

-tected in his ownership of the stock, and is not affected by a subsequent attachment or execution levied on such stock for the debts of the registered stockholder, even though such purchaser has neglected to have his transfer registered on the corporate books, thereby allowing his transferrer to appear to be the owner of the stock upon which the attachment or execution is levied." Cook Cor. section 487. This author says it is so held in New York, Pennsylvania, New Jersey, Michigan, Minnesota, Missouri, Delaware, Nebraska, Tennessee, Kentucky, Louisiana, Mississippi, Texas and Washington, independently of any statute on the subject. In a large number of States, the purchaser in such case, is protected by statute. In still other States, a purchaser does not acquire any right to the stock as against an attaching creditor of the debtor, unless it is transferred to him on the books of the company before levied upon. The difference in the decisions is attributable, for the most part, to the peculiar terms of the statutes of the several States, bearing upon the question, and to differences in construction of like and similar statutes by the courts of different States. Where there is no statute, expressly or impliedly forbidding a sale of stock without registration, it is generally, if not universally, held that the purchaser takes the legal title without a transfer of the stock on the books. Even in those jurisdictions, in which the statute declares that the stock shall be transferrable only on the books of the corporation, it is held that an unregistered transfer or assignment gives the purchaser a perfect equitable title as between him and the assignor, and any person claiming under the latter. The reasoning of the court in *Scripture* v. *Franceslown Soapstone Co.,* 50 N. H. 571, on this subject seems to be in perfect consonance with the rules and principles upon which contracts and rights of property stand. The court said, in part: "It seems too clear for argument that the ownership of the shares passes from the seller to the buyer by force of the contract of sale, and not by operation of law; and if that be so, the buyer's title, so far as the seller is concerned, attaches the moment this contract is fully consummated between them. This kind of property, being an intangible right, somewhat akin to the right to receive money due upon a bond or other chose in action, is incapable of actual manual delivery. All the seller can do, that corresponds at all

to the delivery of personal chattels in other cases of sale, is, to hand over to the buyer his certificate, with a sufficient assignment by deed or otherwise, to entitle him to a transfer of the shares on the books of the company. When the seller has done this, his power and duty in the matter are ended, and it is at the option of the purchaser whether the transfer shall be recorded or not. If the purchaser omits to have the record made, he can claim no rights as a member of the corporation; and he also incurs the further risk of having his title defeated by a subsequent attachment or sale to a *bona fide* purchaser. It is difficult to see any substantial difference between the position of this plaintiff after the sale and assignment of the shares to him by the owner and before a transfer was made on the books, and that of the grantee in a deed of land before his deed is recorded. In both cases the seller has parted with his title, and, as to him, the buyer has acquired it. It is only third persons in either case whose rights or interests are affected by the omission. In the case of an unrecorded deed, the grantor continues to be clothed with evidence of ownership after the conveyance, very similar to that which remains with the seller of shares before the transfer has been entered on the books. The record shows that he is still the owner of the land, when in fact he is not; and, so far as any interest a creditor can have in the matter is concerned, the same is precisely true in the case of shares in a corporation sold but not transferred on the books. The statutes which we hold require the transfer of shares to be entered on the books of the corporation kept for that purpose, are certainly no more explicit and absolute than that which requires the recording of deeds. The object of the law, so far as creditors are concerned, is the same in both cases. As between the parties the title passses by contract and not by the record in both cases alike."

It is to be observed that the New Hampshire court holds that the statute making the stock transferable only on the books of the company is in the nature of a registration law for the benefit of purchasers and creditors, in consequence of which, an unregistered purchase is not good against a subsequent attachment, but it does hold that, as between the parties, the equitable title passes, notwithstanding the statute. Many of the courts hold that, under such a statute, the legal title passes as between the parties,

while only an equitable title passes as against the corporation and *bona fide* purchasers. Clark Cor. 1785. "In those states in which an unregistered transfer conveys the legal title to the shares, and not merely an equitable title, an unregistered transfer will necessarily convey a good title as against subsequent attaching or execution creditors of the transferrer, whether the latter has notice of the transfer before his levy or not, unless the circumstances are such as to estop the transferee to set up his title, or the transfer is fraudulent as against the creditors of the transferrer. In those jurisdictions in which it is held that the legal title remains in the transferrer, the courts have not agreed as to the effect of an unregistered transfer as against an attaching or execution creditor of the transferrer." Clark Cor. 1794. "If a transfer on the books of a corporation is not required by the charter or by-laws, nor by any general law, it is not necessary to give a transferee a perfect title. In such a case, a transfer by delivery of the certificate of stock duly assigned, although not registered on the books of the corporation, will prevail in all jurisdictions over a subsequent attachment by a creditor of the transferrer, whether he had notice of the transfer or not. And the same is true where registration of transfers is required by statute, not for all purposes, nor for the protection of creditors, but merely for the protection of the corporation and its creditors. "It requires a clear provision of the charter itself, or of some statute," said the Massachusetts court, "to take from the owner of such property the right to transfer it in accordance with known rules of the common law. And by those rules, the delivering of a stock certificate, with a written transfer of the same to a *bona fide* purchaser, is a sufficient delivery to transfer the title as against a subsequent attaching creditor." Clark. Cor. 1798, citing *Boston Music Hall Ass'n* v. *Cory,* 129 Mass. 435. In the earlier Massachusetts cases, the contrary of this doctrine had been held, and since the decision of the case just referred to, the legislature of that State, has passed a statute conforming to the principles announced therein.

In *Continental Bank* v. *Elliott National Bank,* 7 Fed. Rep. 369, holding that an unrecorded transfer of national bank stock will take precedence of a subsequent attachment in behalf of a creditor without notice, Lowell, Judge, delivering the opinion, discusses the question most lucidly and exhaustively, reviewing

many of the authorities, both American and English. In speak-
ing of the statutes concerning transfers of the shares upon the
books of the company, he says: "No doubt it is sometime intend-
ed as a record of persons liable for the debts of the company, and
is so in the case of national banks; but the great weight of
authority is that it is not intended for the benefit of creditors of
the individual shareholder. Some of the courts hold that the
unrecorded transfer passes only an equitable title; others, that
it gives a legal title. I assume that by the decisions in the courts
of the United States only an equitable title is acquired. That
point is unimportant." Again he says, at page 371: "It is a
general rule that creditors, whether they proceed by an attach-
ment on *mesne* process, seizure on execution, creditor's bill, or
through an assignee in bankruptcy, must take their debtor's
property subject to all equitable as well as legal charges, liens,
or opposing titles. Willis J., in giving judgment in the Queen's
bench in 1868, in a case quite analogous to this, against the right
of seizing shares of the apparent owner, said that it was a rule
applied by that court more than a hundred years before, in the
analogous case of the statutory execution under the bankrupt law,
that the creditors can have no more than a debtor was entitled to
in equity or at law. *Pickering* v. *Ilfracombe Ry. Co.,* L. R. 3 C.
P. 235, 251. It has been the law of the Lord Mayor's Court in
London, from the time of Richard I., that an equitable assign-
ment of a chose in action should prevail against an attachment.
*Westoby* v. *Day,* 2 E. & B. 605. This application of the rule ob-
tains in Massachusetts, and in the United States generally,
though a few courts hold otherwise." It is proper to say here
that it is the rule in this State. *Neill & Ellingham* v. *Produce
Co.,* 41 W. Va. 37, 58; *Wall* v. *Railroad Co.,* 52 W. Va. 485,
492; *B. & O. R. R. Co.* v. *McCullough,* 12 Grat. 595.

Except in those cases in which a statute is held to have inhib-
ited any transfer except on the books of the company, the deliv-
ery of the certificate with an assignment to the transferee passes
either a legal or an equitable title to the shares, but in this case,
no certificates appear to have been issued, and there was no de-
livery of any certificate between the parties. The only evidence
of the assignment is a written instrument not under seal pur-
porting to make over, transfer and assign, for a valuable consid-
eration, the shares therein described. Is this sufficient to pass

any title? The shares exist independently of any certificate. They are a species of incorporeal property. "A share certificate is merely the paper representative of an incorporeal right and stands on a footing similar to that of other muniments of title. It is not in itself property, but is merely the symbol or paper evidence of property; hence, the proprietary right may exist without a certificate." 10 Cyc. 588. "This legal relation and proprietary interest, on which it is based, are quite independent of the certificate of ownership, which is a mere evidence of title. The complete fact of title may very well exist without it." Mr. Justice Matthews, in *National Bank* v. *Watsontown Bank*, 105 U. S. 217, 222. "Millions of dollars of capital stock are held without any certificate; or, if certificates are made out, without their ever being delivered. A certificate is authentic evidence of title to stock; but it is not the stock itself, nor is it necessary to the existence of the stock. *Crumlish* v. *Railroad Co.*, 40 W. Va. 627. It certifies to a fact which exists independently of itself. And an actual subscription is not necessary. There may be a virtual subscription, deducible from the acts and conduct of the party." Mr. Justice Bradley, in *Pacific National Bank* v. *Eaton*, 141 U. S. 227, 234. Other cases to the same effect are, *First National Bank* v. *Gifford*, 47 Ia. 575; *Brigham* v. *Mead*, 10 Allen (Mass.) 245; *Curtis* v. *Crossley*, 59 N. J. Eq. 358, 361; *Agr. Bank* v. *Burr*, 11 Me. 256; *Cuttle Co.* v. *Burns, Walker & Co.*, 82 Tex. 50, 56.

A share of stock being an incorporeal right, incapable of manual delivery, and the certificate being nothing more than evidence of its existence and of title to the share in the holder, it is obvious it may be assigned without a certificate and in the mode adopted by the defendant here and his transferee, but, for this, there is authority. "Subscription rights in a proposed corporation need not be evidenced by written instrument in any particular form, but may be established by parol. A subscription right in a proposed corporation is assignable by parol, and ownership passes immediately on consummation of the sale, and by force thereof, and not by operation of law." *Manchester St. Ry. Co.* v. *Williams*, 52 Atl. Rep. 461. A certificate of stock is important for many purposes, but not for the purpose of a transfer as between parties. *Id.* 464; *Brigham* v. *Mead*, 10 Allen, 245; *Field* v. *Pierce*, 102 Mass. 253, 261;

*Cattle Co.* v. *Burns, Walker & Co.,* 82 Tex. 56; *Baker* v. *Wasson,* 53 Tex. 150; *Agr. Bank* v. *Burr,* 11 Me. 256, 267; *Curtis* v. *Crossley,* 59 N. J. Eq. 351, 361.

As, by the assignment or transfer from the debtor to his transferee, evidenced by the informal written instrument executed and delivered by the former to the latter, title to the stock, legal or equitable, passed, what is the status of that title as against the attaching creditor, assuming that it is only the equitable title? In addition to the authorities already noted as maintaining its superiority to the attachment lien, the following is quoted from that latest and invaluable work, Cyclopedia of Law and Procedure, Vol. 4 p. 632: "The right of a creditor to property attached must be determined by the state of the title at the time the attachment was made, and in the absence of fraud and statutory regulations, he only obtains the rights which the debtor had in the property at the time, for the creditor is not in the position of a *bona fide* purchaser." The rule applies where the debtor holds title to property subject to a valid outstanding charge or lien, whether the lien arises by agreement of parties, by operation of law or a prior garnishment. *Id.* 633. The only exception to the rule, independent of statute, is that of the participation of the adverse claimant in the fraudulent purpose of the debtor, in which connection it is to be noted that, in the case of a sale of personal property, retention of possession by the seller is strong evidence of fraud, when the sale obstructs the rights of a creditor. *Id.* 635. It makes the sale *prima facie* fraudulent. *Davis* v. *Turner,* 4 Grat. 422; *Forkner* v. *Stuart,* 6 Grat. 198; *Dance* v. *Seamon,* 11 Grat. 778; *B. & O. R. R. Co.* v. *Glenn,* 28 Md. 287, 324. What effect this rule of evidence is to have is an inquiry which more properly arises on the question of the validity of the sale, to be disposed of in a subsequent portion of this opinion.

As a rule those courts which hold an unregistered transfer not good, as against the creditors of the transferrer, do not put it upon the ground that the presence of the shares on the books of the corporation in the name of the transferrer, after the sale, is tantamount to the retention of the possession of tangible personal property after sale, and is, therefore, evidence of fraud. The supreme court of New Hampshire, in *Pinkerton* v. *Railroad Co.,* 42 N. H. 424, and in *Scripture* v. *Soapstone*

*Co.,* 50 N. H. 571, puts it partially upon that ground. In the former case, the court said that the legislature had made plain its intention that the entry upon the stock record should be the appropriate indication of ownership, as it had made provision in regard to returns of stock by the clerks or treasurers for the purposes of taxation, private liability and attachment, and, in the case of manufacturing corporations, had ordained by express provision that a transfer of stock should avail nothing against an attachment until entered upon the corporation records. Whether, in the absence of such statute, the court would have arrived at the same conclusion nobody can tell, but there is no reason to assume that it would. In 1887, the legislature of that State made an unregistered transfer good against an attachment. Laws of 1887, chapter 16. In Connecticut, the original idea was that no title, either legal or equitable, could pass by a transfer unless recorded on the books of the corporation. *Marlborough Mfg. Co.* v. *Smith,* 2 Conn. 579; *Northrop* v. *Turnpike Co.,* 3 Conn. 544; *Northrop* v. *Curtis,* 5 Conn. 246; *Oxford Turnpike Co.* v. *Bunnel,* 6 Conn. 552. This position, however, was abandoned in *Colt* v. *Ives,* 31 Conn. 25, propounding the *quaere,* whether by an unregistered transfer, an equitable title passed, and holding that, if so, it was not good against an attaching creditor, unless the transferee did all he could to have the transfer made before the attachment was levied. The statutes of Connecticut seem not to have been so rigid in their requirements in respect to the registration of stock as those of New Hampshire. The court, in the case last cited, after referring to the rule that possession of tangible property is an indication of ownership, says: "So in respect to the assignment of ordinary choses in action, there must be notice of an assignment to the debtor—the assignment conveying but an equitable interest in the thing, and notice to a trustee being in equity the ordinary and only practicable mode in which an assignee can protect his interest. And in the case of the purchase of stock in a corporation, there must be such a transfer of it as the legislature in the charter or by statute prescribes; and notice of the assignment of choses in action, and the transfer required by statute of corporate stock, stand in lieu of the taking and retaining of the possession of personal chattels sold, being the only possession the nature of the property admits of."

As to choses in action, this is good law when applied to the case of a subsequent purchaser for value and without notice. But is it good law as to a creditor whose rights rise no higher than that of his debtor? That it is not considered sound even in Connecticut is evidenced by later decisions of that court, in *Morry* v. *Hawkins,* 57 Conn. 453, the court said: "In the absence of fraud, stock may stand in the name of one which belongs to another, without being liable to attachment for the debts of the nominal owner. This must be so as to all creditors who have not been misled or deceived by it, and as to those who are advised as to the true state of the title." This proposition was referred to in *Skiff* v. *Stoddard,* 63 Conn. 198, as established Connecticut law. In *New York Commercial Co.* v. *Francis,* 83 Fed. Rep. 769, the proposition is applied as sound Connecticut law, the court saying in its opinion: "It is one which we are satisfied is in accordance with the general rule, and with the principles of justice, unless the equitable owner is prevented by an estoppel from showing the truth, or there has been some illegality or violation of a statutory requirement." In Alabama, an unregistered transfer is not good against an attachment, because the statute expressly declares that the holder of stocks in corporations must have the same transferred on the books of the company within fifteen days, else the same shall be void as to *bona fide* creditors and subsequent purchasers without notice. In Arkansas, the statute gives precedence to the attachment unless a certificate of transfer is filed with the county clerk. In California, Colorado and New Mexico, the statute declares that no transfer of stock shall be valid for any purpose whatever until entered on the corporate books. In Indiana, the attachment prevails because the statute declares that stock shall be transferable on the corporate books and not otherwise. In Iowa, the statute says transfers shall not be valid except as between the parties until a registry is had on the corporate books. See Cook Cor. section 49, note 5. In Vermont, the statutes were much like those of New Hampshire when *Cheever* v. *Meyer,* 52 Vt. 66, was decided, and the decision was rested wholly upon statutory grounds, treating the statutes as a registration law for the protection of creditors and subsequent purchasers without notice. The early cases in Massachusetts, giving precedence to the attachment,

rested upon the same ground. In *Fisher* v. *Bank,* 5 Gray 373,. holding that shares in a bank whose charter provides that they shall "be transferable only at the banking house and on its books," cannot be transferred in any other way so as to give the transferee a good title against a creditor of the vendor who attaches them without notice of the transfer, the decision was based wholly upon the statute. As before stated, this rule has been overturned in that State by a statute. Before the passage of the statute, the court, in *Dickinson* v. *National Bank,* 129 Mass. 279, in construing the United States statute concerning national banks, which did not say the stock was transferable only on the books of the bank, although the by-laws of the corporation did say so, held that an unregistered transfer must prevail over an attachment in favor of a creditor of the transferrer.

The proposition asserted in *Colt* v. *Ives,* 31 Conn. 35, the soundness of which has been hereinbefore questioned, is the doctrine asserted in *Dearle* v. *Hall,* 3 Russell 1, and confirmed in *Foster* v. *Cockrell,* 3 Cl. & Fin. 466, to the effect that of two innocent purchasers of a merely equitable interest, he shall be preferred who first gives notice to the trustee or holder of the legal title. The Connecticut court seems to have treated a creditor as standing on the same footing as a purchaser for value without notice. The fallacy and unsoundness of it is clearly shown in the opinion in *Continental Bank* v. *Elliott National Bank,* 7 Fed. Rep. 269, 375. Lowell, J., said: "1. Though the corporation is for some purposes a trustee for the shareholders, the latter have an independent legal property in their shares which they can convey, and whether their actual conveyance is legal or equitable is of no consequence. 2. The doctrine applies in England only to purchasers, and not to creditors seizing or attaching, even though a statute gives a right to seize all shares standing in the debtor's name in his own right. This statute was once held by the Queen's Bench to mean that the creditor might seize what the register showed to be apparently the property of the debtor, (*Watts* v. *Porter,* 3 E. & B. 743;) but this has been overruled, on the ground that the legislature cannot be supposed to have intended to take one man's property for another man's debt, without the most explicit statement of such a purpose; and therefore the 'right'

refers to the equitable as well as legal right. *Dunster* v. *Lord Glengall,* 3 Ir. Ch. 47; *Scott* v. *Lord Hastings,* 4 K. & J. 633; *Beavan* v. *Earl of Oxford,* 6 D. M. & G. 524; *Eyre* v. *McDonald,* 9 H. L. 619; *Robinson* v. *Nesbitt,* L. R. 3 C. P. 264; *Pickering* v. *Ilfracombe Railway Co.,* 1 R. 3 C. P. 235; *Gill* v. *Continental Gas Co.* L. R. 7 Ex. 619. A few courts in this country have carried the doctrine of *Dearle* v. *Hall* so far as to uphold the garnishment of a non-negotiable debt which had been equitably assigned without notice. We have already seen that this is not the law in England nor in Massachusetts. Neither is it the law of the United States generally. Drake, Attachments, c. 24; *Cornick* v. *Rickards,* 3 Lea. 1. The supreme court of Tennessee in that case refused to extend the rule to shares of stock, though it applies in that state to choses in action. As shares are not chosen in action, and as attaching creditors are not purchasers, *Dearle* v. *Hall* is not in point."

We have a statute on this subject, and it does not extend the principle so as to protect creditors. Assignees of choses in action are required to "allow all just discounts, not only against themselves, but against the assignors, before the defendant had notice of the assignment." Code, chapter 100, section 1. Discounts are not the debts of the assignor or assignee.

Another statute gives the right to any person to set up, against an attachment, any interest in, or lien upon, the property attached which he may have without regard to notice. Code ch. 106 §23. *First National Bank* v. *Harkness,* 47 W. Va. 156; *Crim* v. *Harmon,* 38 W. Va. 596.

This inquiry as to the grounds upon which some of the courts give precedence to an attachment over an unregistered transfer results in the conclusion that they put it upon the statutes, either authorizing or requiring transfer to be made on the books of the corporation, some of them adopting the view that, as there can be no visible change of the possession of a share, the legislature intended the record to take the place of visible possession, by way of analogy to the common law rule relating to tangible property, and others adopting the view that the statutory provision is in the nature of a registration law for the protection of the public. It has been shown that where the former theory was adopted, it has either been aband-

oned or displaced by statutes. Moreover, there never was any basis for the assumption of legislative intent to require recorded evidence of ownership of shares, when the statute did not make the record a public one. It might as well be assumed that some record ought to show who owns other choses in action, evidenced by notes, bonds and other obligations. The latter has been almost universally condemned as imputing to the legislature an intent not warranted by the language of the statute or the nature of its subject matter. Of it, Thompson Com Cor. §2411, says: "But this view, which makes the stock and transfer books public records, open to the inspection of the public, is plainly untenable unless the statute law (as it does in some states) obliges the corporation to expose such records to the inspection of the public. Otherwise they are strictly private records, sustaining no analogy to the records of transfers of title required to be made and kept in public recording offices; and even these last records import no notice except in those cases where the statute law expressly so provides."

Our statute, viewed in the light of the foregoing authorities and principles, affords no ground for a conclusion that an attachment in favor of a creditor of a transferrer will prevail over the title, be it legal or equitable, of a transferee, when the transfer is not entered upon the transfer book of the corporation. It does not say the stock shall be transferable only on the books of the corporation. It is silent as to what shall constitute a transfer. The provisions relating to transfer are found in sections 21, 22, 35, 36, 37 and 38 of chapter 53. The last mentioned section has no important bearing upon this question, and the others read as follows:

"21. A transfer book shall be kept by the corporation in which the shares shall be assigned under such regulations, if there be any, as may have been prescribed by the by-laws."

"22. No share shall be transferred without the consent of the board of directors, until the same is fully paid up, or security given to the satisfaction of the board for the residue remaining unpaid. And where bond and security have been given to the corporation for any sum remaining unpaid upon stock, no transfer shall affect the validity of such bond and security."

"35. The board of directors shall cause to be issued, if demanded, to any person appearing on the books of the corporation to be the owner of any shares of its stock, a certificate therefor, under the corporate seal to be signed by the president and such other officer, if any, as the board may direct; which certificate shall show the amount paid on each share."

"36. A stockholder to whom such certificate has been issued shall not be allowed to transfer the shares therein mentioned, or any part thereof, without delivering up the said certificate to the corporation to be canceled, unless the same be lost or destroyed, or sufficient cause be shown to the satisfaction of the board of directors why it cannot be produced."

"37. If any person, for valuable consideration, sell, pledge, or otherwise dispose of any shares belonging to him to another, and deliver to him the certificate for such shares, with a power of attorney authorizing the transfer of the same on the books of the corporation, the title of the former shall vest in the latter so far as may be necessary to effect the sale, pledge or other disposal of the said shares, not only as against the creditors of, and subsequent purchasers from the former, but subject nevertheless to the provisions contained in the nineteenth section of this chapter."

It is to be observed that no certificates of stock are required to be issued unless demanded by some person appearing on the books of the corporation to be the owner of the shares. While a certificate, when issued, is generally deemed by the courts to be a muniment of title, our legislature, not deeming it essential to the existence of the shares, nor expedient on the ground of public policy, has failed to require corporations to issue them, unless demanded. The demand may be made by any person appearing on the books of the corporation to be the owner of the shares. He is an owner before he acquirs a certificate. The certificate is clearly only evidence of title which exists without it and independently of it. He may exercise his own pleasure about taking a certificate. If he does accept one, however, then he is placed under restrictions as to the mode of transfer imposed by section 36, and his transferce is given special protection by section 37. These two sections will be further discussed later on. They clearly do not inhibit a transfer without a certificate, for they only relate to stockholders who have taken certificates and

a stockholder is not bound to take a certificate in order to complete his title. They clearly do not cover the whole subject of transfer. Section 22 imposes no conditions upon the exercise of the right to transfer, except that, if a share is not fully paid up, no transfer of it shall be made without the consent of the board of directors, unless security for the residue remaining unpaid, satisfactory to the board, be given. If the board of directors consent, it may be transferred, although not paid up nor any security given. If it is paid up, consent of the board of directors is not necessary, and the owner of it may sell it at his pleasure.

Section 21 requires the corporation to keep a transfer book "in which the shares shall be assigned under such regulations, if there be any, as may have been prescribed by the by-laws." This, no doubt, means that the names of the shareholders, together with the number of shares owned by them respectively, shall be recorded in the book kept for that purpose, but it does not mean that the entry in that book shall be necessary to pass the title. It does not say so and nothing but a strained construction of it could make it mean that. Nowhere in our corporation laws does it appear that any of the records required to be kept are in any sense public records. Section 43 of chapter 53 requires a list of the stockholders, showing the number of shares and votes to which each is entitled to be hung up in the most public room at the principal office or place of business of the corporation, for one month before every annual meeting of the stockholders. Section 47 of the same chapter declares that the funds, books, correspondence and papers of the corporation shall be at all times subject to the inspection of the board of directors or a committee thereof, appointed for the purpose, or of any committee appointed for the purpose by a general meeting of the stockholders. No provision appears to give to the individual stockholder, much less a creditor of his, a creditor of the corporation, or a wholly disinterested person, the right of inspection at all times, or at any time. The board of directors is required by section 46 of chapter 53 to make a report to the stockholders at the annual meeting, showing the condition of the corporation, and then declares that "the board shall furnish to each stockholder requiring it, a true copy of such report, together with a list of the stockholders and their places

of residence." By section 47 of chapter 53, every stockholder has a limited right of inspection. It is only for thirty days before the annual meeting of stockholders, and extends, not to the "property and funds, books, correspondence and papers of the corporation," but only to "the minutes of the resolutions and proceedings" of the board of directors.

Not a word appears in any of the provisions just discussed from which it can reasonably be inferred that they were intended by the legislature to vest in the general public, as creditors or otherwise, any rights by which the transfer of shares is in any way impeded or restricted. But when sections 35, 36 and 37 of chapter 53 apply, it may be different. Whether Condon ever took any certificates for the shares in question does not appear. As he could hold the shares and transfer them without certificates, the court cannot assume that he held them otherwise. However, as the construction of these sections may be deemed to have some bearing upon the question now under consideration, certain purposes which they seem to have been intended to serve will be mentioned. JUDGE HOLT, speaking for this Court, in *Donnally* v. *Herndon,* 41 W. Va. 519, after quoting sections 19 and 37 of chapter 53, said: "The manifest purpose of the statute is to permit the corporation to go by its books, in ascertaining who is the owner of the stock, and not require it to go on the street and hunt them up.* * * Evidently one of the objects of our statute cited above was to free banks and other corporations from the danger of such loose and unreliable evidence of notice of ownership of stock, by authorizing them, in their multitudinous details of affairs, to go by their books, in determinig the ownership of stock, in paying dividends, so long as they are acting in good faith and with reasonable care."

Sections 36 and 37 do not apply unless a certificate has been issued. That certificate is evidence against the corporation of the existence of the share and its ownership. As long as it is out of the possession of the corporation, it is a continuing affirmation by the corporation of the title and interest of the person to whom it is issued. 10 Cyc. 590. A transfer made on the books of the corporation of the shares represented by the outstanding certificate might operate as a fraud upon the rights of an innocent purchaser of the stock. They are assignable and are sometimes said to be *quasi* negotiable instruments, though

they are not really negotiable in the true sense of the term. 10 Cyc. 590. Nor are they generally held to be securities in the legal sense of the term (10 Cyc. 590), but they are largely so used, and our statute, section 37, makes them evidence of complete title as between the parties to the sale and of a valid pledge when they are so used. To allow a transfer on the books of the company, inconsistent with the rights evidenced by the outstanding certificate, would produce confusion and open the door to fraud. To this extent the legislature may have intended to protect the public against fradulent transfers on the books when certificates are outstanding; but the corporation and all its stockholders, whether holding certificates for their shares or not, have a deep interest in the subject. "The corporation has a dangerous duty to perform when stock has been attached or sold under levy of execution, and a registry is requested by the purchaser at such sale or by a purchaser of the outstanding certificate of stock. Cook. Cor. section 489.

Whether intended for the protection of the public as well as the corporation, or not, it seems clear that section 36 inhibits only a transfer upon the books of the corporation without a surrender of the certificate, and does not further restrict the power of the owner of the shares over them. It compels the officers to keep the record of shares consistent with the outstanding certificates of shares, so that neither the corporation, holders of stock nor purchasers of shares can be *prejudiced or endangered by any evidence of title made by the corporation itself.*

The holder of a certificate being thus protected from any injurious action at the office of the company, his transferee of that certificate, whether purchaser or pledgee, is also protected both from the acts of the corporation by said section 36, and also from the acts of the transferrer, and all persons claiming under him, whether as purchasers or creditors, by the provisions of section 37, declaring that if any person sell, pledge, or otherwise dispose of any shares belonging to him to another, and deliver to him the certificate for such shares, with a power of attorney authorizing the transfer of the same on the books of the corporation, the title of the former shall vest in the latter so far as may be necessary to effect the sale, pledge or other disposal of said shares, not only as between the parties themselves,

but also as against the creditors of, and subsequent purchasers from, the former. Is there a word in the three sections by which any intent to confer any new rights upon the creditor of a stockholder is manifested? Because section 37 says the delivery of the certificate, together with a power of attorney shall effect a complete sale or pledge as between the parties and as to subsequent purchasers from, and creditors of, the transferrer, does it follow that, without such delivery, the transferee, under a purchase for value and without fraud, would not have a title superior to the claim of a creditor of the transferrer under a subsequent attachment or execution, or of a subsequent purchaser who has not himself acquired the certificate? Suppose the certificate is lost or destroyed or not within reach when the owner of the shares represented by it wishes to pledge or sell them, and the purchaser or pledgee is willing to part with his money on the faith of a simple instrument of writing, purporting to assign the shares, can this not be done, subject to the rights of any third party who may obtain the certificate? Not a word in the statute asserts the contrary. Is it to be implied? Restrictions upon the right to make contracts are not often so established. The statute only declares what shall be the effect of making a transfer in a particular manner, leaving the parties to be governed by the general principles of law and equity, if they make it in any other way. If the transfer be made in the manner indicated, the transferee need show nothing but the certificate and power of attorney to establish a perfect title as against everybody but the corporation. Without the certificate and power of attorney he would be required to show when, under what circumstances, and for what sum of money or other valuable consideration, he became the owner. It is obvious that, unless section 36, or some other provision of the statute, is to be regarded as a registration law for the protection of the public, who have no access to the books of the company, these sections are intended only to protect the corporation and those who claim under the certificates of stock. That neither section 36 nor any other section of chapter 53 is a public registration statute is made plain by what has been said in former parts of this opinion. That being true, the mode of sale mentioned in section 37 relates only to the matter of registering the transfer on the books of the corporation, for its

protection and that of holders of the certificate. These observations on sections 35, 36 and 37 of chapter 53 are only made for the purpose of showing that nothing in them conflicts with the conclusion reached respecting the status of an unregistered transfer, under our statutes, when no certificate is involved, and are not to be taken as constituting a binding judicial construction of the provisions of said sections. Shares of corporation stock can only exist by virtue of a statute. Our statute, as shown, makes them property and vests the subscribers with title before any certificate is issued, and does not require one to be issued. Owning the share without a certificate, he may sell it without one, or with one, at his election. The sale in this case was of stock for which no certificate had been issued. The *jus disponendi* is an incident of ownership, 10 Cyc. 577, and it may be exercised in any way not prohibited by the law. As our statute does not prescribe any mode of sale when no certificate has been issued, the owner may dispose of his share in such manner as would suffice to pass his title to any other chose in action or intangible property. The delivery of a written instrument assigning the property, is clearly a symbolic delivery, if any delivery is necessary in such case.

An account for merchandise, for labor, for materials, for rent or for any other chose in action, not evidenced by writing or acknowledgment of the debtor, may be assigned by a writing such as was signed and delivered in this case, purporting to assign the shares in question. Why is it not sufficient in this case? There can be no substantial, nor even a plausible technical reason, as has been shown by authorities as well as by the provisions of the statute, making possible the existence of this kind of property.

In *Fisher* v. *Essex Bank,* 5 Gray (Mass.) 373, holding that the statutory mode of transfer was exclusive, the statute having said shares were transferable *only on the books of the bank* and at the banking house, the court said: "Before any method was established by positive law, how, by what mode, or by what precise and definite act, such property should be considered as ceasing to be the property of the seller and becoming the property of the purchaser, courts of justice might well resort to the common law modes of transferring similar incorporeal interests, and hold that a delivery of the only muniment of title

held by the owner, with the execution and delivery of an ·assignment of his interest, by indorsement on the certificate or otherwise, should by analogy be held to be a valid transfer, and, when notified to the bank, should be considered as having taken effect at the date of such delivery."

As before demonstrated, the notice is only required as against subsequent purchasers.

Having no doubt about the sufficiency of the transfer to vest title in the transferee, nor as to the superiority of that title, equitable though it may be, over the attachment lien, if acquired for value· and without fraud, nothing remains to be determined but the question whether the purchase was for value and in good faith. .

At a sale under a decree made by the circuit court of the United States for the District of West Virginia, in May, 1890, Levi Z. Condon became the purchaser of sixty-six thousand acres, or more, of wild lands, situate in Randolph and other counties, which sale was confirmed July 1, 1890. On the 20th day of December, 1894, it appearing to the court that Condon had theretofore paid into the registry of the court, the balance of purchase money, and had by deeds dated March 25, 1892, and April 1, 1892, conveyed to the Condon Lane Boom & Lumber Company, a corporation, the said lands, it was ordered that the same be conveyed to said company, and it was accordingly done. At about the time of Condon's conveyance to the Condon Lane Boom & Lumber Company, or shortly before that time,. he owned a mill on Dry Fork River, at Bretz, some miles below the timber lands, and was trying to devise some way of getting the timber down to that point, and desired to sell the hemlock bark on the lands, and with the proceeds construct, or aid in constructing, a railroad up said river to these lands. H. Stowell says Condon employed him in June, 1892, to find a purchaser for the bark, agreeing to pay him $5,000.00 for his services upon the consummation of the sale, and that afterwards, in February, 1894, a sale of the bark to the United States Leather Company, at the price of $65,000.00, was effected as a result of his serv-ices in exploring the land, ,estimating the value of the bark, and furnishing information to the purchaser. The sale was made in February, 1894, and Stowell assigned his claim for the· $5,000.00 ·to P. Lipscomb, who, in December, 1898, proceeded against Condon in equity, as a non-resident, serving the order

of attachment on the Condon Lane Boom & Lumber Company
as garnishee, and that Company answered, admitting that ac-
cording to its books Condon was the apparent owner of 1,300
shares of common stock and one thousand two hundred and fifty
shares of its preferred stock.

Later Albert N. Horner filed his petition, claiming to have
purchased and paid for all of said stock long before the service
of the order of attachment, and to have owned it at the time
of said service, and still to be the owner of it.   Jeff Lipscomb,
administrator of P. Lipscomb, in whose name the suit was re-
vived, said P. Lipscomb having died after instituting the suit,
filed an answer denying that there had been any valid purchase
of the stock by Horner, and charging that no valuable consider-
ation passed from him for the stock; that the same was placed
in the hands of Horner by Condon "for the sole and express
purpose of hindering, delaying and defrauding the said plain-
tiff" out of the collection of said debt, as well as other creditors.
He was informed and believed that no assignment or transfer
of the stock had been made until after the sending out of the
attachment, and that then Condon and Horner conceived and
executed a plan to defeat the collection of the debt, by transfer-
ring the stock after the service of the writ and dating the trans-
fer back, "in order to give the said pretended transfer a sem-
blance of having been done for a valuable consideration."   All
of which said transaction was intended to hinder, delay and
defraud the creditors of the said Condon and especially "this
plaintiff."

As no replication to this answer was filed and no depositions
were taken on the subject matter thereof after it was filed, it is
insisted, upon the authority of *Snyder* v. *Martin,* 17 W. Va.
278, *Bierne* v. *Ray,* 38 W. Va. 571, and *Lindley* v. *Smith,* 6
Munf. 142, that the allegations of fraud, on the part of Horner,
contained in the answer to his petition, must be taken as true.
Counsel for appellant, Horner, deny the correctness of this po-
sition, saying that no answer was required.   For this they rely
upon the language of section 23 of chapter 106 of the Code, un-
der which the petition is filed.   This section, after authoriz-
ing the filing of the petition, says:   "The court without any
other pleading, shall impanel a jury to inquire into such claim."

Though originally there might have been difference of opin-

ion as to the application of this statute to suits in equity with attachment, the question seems to have been settled in favor of it. In *Chapman* v. *Railroad Co.*, 26 W. Va. 324, the court seems to have approved the ruling in *Anderson* v. *Johnson*, 32 Grat. 558. That was a suit in equity founded upon an attachment and the court held as follows: "Where persons claiming the property attached, or some interest in it, are admitted as parties in the cause, their claim is to be tried by a jury impaneled for the purpose, as provided by the statute, Code of 1873, chapter 148, section 25; and it is error for the court to pass upon the claims without the intervention of a jury." *Chapman* v. *Railroad Co.* was also a suit in equity with an attachment and JUDGE JOHNSON, in discussing it in view of said section of the statute, said: "If the petition shows a *prima facie* right in the petitioner to the property in the petition, a title better than that of the defendant then the court should impanel a jury to inquire into the claim."

Although the inquiry now is not as to the right to a trial by jury, but as to what pleadings are necessary in a case of this kind, the two decisions just referred to and others apply the statute in question to all attachment suits whether in equity or at law. There can be no doubt of its applicability in actions at law and these cases foreclose any question as to the intent of the legislature to apply it to suits in equity.

That it is competent for the legislature to require jury trials in equity proceedings cannot be doubted. In many instances it has authorized and required courts of equity to direct issues out of chancery to the law side of the court for the determination of questions of fact proper for ascertainment by a jury. The statute governing attachment proceedings requires a trial by jury of the issue made on a plea in abatement, denying the existence of the ground upon which the attachment is sued out. Whether the proceedings are entered in the chancery order book or the law order book of the same court is more a matter of form than substance, though it is sometimes error not to enter it in the latter. *State* v. *Irwin*, 30 W. Va. 404. In section 23, providing for intervention by third parties, the legislature may have intended a direction of an issue and trial by jury in all cases, whether the title set up was legal or equitable in its nature. But, if it were an open question, it might well be doubted whether the legislature did so intend, and whether it was in-

tended, when the proceeding is in equity, to alter the rules of pleading, and limit the pleadings to the petition alone.

The statutory provision in question appears for the first time in the Code of 1849. The object of the amendment is stated by the Revisors in their report, page 761, as follows: "This section, as altered from the present law, will close the question, whether a suit in equity is not necessary when a party claims under a subsequent attachment." Up to that time the statute had made no provision for any third party, who desired to dispute the validity of the plaintiff's attachment or who desired to assert a lien on the attached property under any other attachment or otherwise. The provision was as follows: "Whenever the goods and chattels, taken by virtue of any attachment, shall be claimed by any person, other than such debtor, the court shall immediately, (unless good cause be shewn by either party for a continuance), direct a jury to be impaneled to enquire into the right of property." Code 1819, chapter 123, section 16. That chapter relates to both foreign attachments in equity and attachments at law, but the distinction between the two kinds of proceeding seems to be very clearly marked and said section 16 seems to be applicable to the latter only. The doubt and uncertainty alluded to by the Revisors is exemplified in *Erskine* v. *Staley,* 12 Leigh 406, and *Moore* v. *Holt,* 10 Grat. 284. Both of these cases arose before the amendment of the attachment statute adverted to and their nature is indicated by point one of the syllabus in *Moore* v. *Holt,* which reads as follows: "Process in a foreign attachment is served upon a garnishee having property of the absent debtor in his hands; and afterwards other creditors sue out attachments at law against the same party as an absconding debtor, which are served upon the same garnishee; and before the foreign attachment is ready for a hearing, they obtain judgments and an order for the sale of the property in the hands of the garnishee. The plaintiff in the foreign attachment may amend his bill and enjoin the same." In that case the court very clearly points out the difference between foreign attachment in equity, as it existed in Virginia at that time, and the statutory attachment in equity and at law which now obtains in Virginia and this State. In foreign attachment the process with an endorsement on it in the nature of

an attachment, created a lien, although no affidavit at all had been filed; but, to authorize the officer to take the effects out of the hands of the garnishee, or require him to give security to have the same forthcoming, an affidavit was necessary. For the amount and nature of the claim reference was had to the bill. The bill and process with the endorsement gave a lien. Hence, the title was drawn into the main suit. The bill asked for subjection of the property to satisfaction of the debt, and brought it within the jurisdiction of the court. In an action at law, the property came into the case by reason of the levy of the attachment only. All this suggests the *quaere* whether the legislative object was not merely to enable a lien holder by execution or otherwise, and the person claiming an equitable title to the attached property in a proceeding at law, to assert his claim in a court of law, a thing which he could not do, or to do which his right before the amendment was doubtful, and not to work any change whatever in the rules governing the pleadings, when the suit in which the attachment is sued out is in equity? It is to be observed that Judge Moncure's discussion of the subject in *Anderson* v. *Johnson,* is limited to a single paragraph of about a half-dozen lines and makes no reference whatever to the history of the subject or reason of the amendment. Nor does JUDGE JOHNSON enter upon any examination of it. Moreover, I see no good reason why it may not here be held that the parties, by going into equity, have waived the right to a trial at law, since fraud, the real core of the controversy, is always a matter of equity cognizance. Though not free from doubt as to the proper construction of the section, I yield to the views of the other members of the Court who are satisfied with the interpretation which the Virginia court has given the statute and which this Court has approved as already stated.

Under a misapprehension of the law, superinduced by the action of the parties, the court treated the petition of Horner as a cross-bill, and heard the matters in difference between him and the attaching creditor upon it and the answer thereto and upon the depositions taken and filed by the parties. In bringing the case on to be heard, the decree contains the usual recitals, except that it refers to the agreement between the parties, upon which also it was heard. This is an agreeemnt entered into between Horner and the plaintiff, authorizing the filing of Hor-

ner's petition with the clerk of the court in vacation, and the answer of the plaintiff to the petition within forty days from the date of the agreement, and providing that thereafter the parties might go on "and take their proof upon said petition just as if the same had been filed in court and mature the same for hearing but either party shall have a right to object to any pleading, or proof just as if the same were filed in court." In an effort to be more explicit the parties repeated the agreement in the following terms: "All legal objections which either party may have to any pleading, or evidence, are reserved for the consideration of the court and the hearing of said petition shall be had just as though the same and the bond of the plaintiff and the answer of the plaintiff had been tendered in open court for the action of the court and it is further agreed that the parties may take such legal and proper proof upon legal notice as they have a right to take."

Assuming either that the statute did not contemplate a trial at law of the matters in difference between the petitioner and the plaintiff, or that, if it did, they might elect to try according to the rules of equity procedure, depositions were taken and filed and the court disposed of the case as one in equity. Considered as a trial at law by the court in lieu of a jury, how does the case stand? No witnesses were produced and examined to prove the contention of either party. No ground is shown for the use of depositions instead of oral testimony of witnesses. Had objection been made, the depositions could not properly have been used and there was no evidence before the court. However, counsel for appellant now insists that the action of the court shall be treated as a trial at law and the depositions to prove his petition as having been properly admitted. The court, erroneously treating the proceeding as governed by the rules of equity practice, regarded the allegations of fraud in the answer as true and entered a decree for the plaintiff. This operated a complete surprise upon the petitioner. To permit him now to turn the proceeding into one at law, and give him the benefit of his depositions, would work an equally great surprise upon the plaintiff. Hence, it is plain that, under a misconception of the nature of the proceeding, there has been a mistrial, operating injustice to both parties. The plaintiff has had no op-

portunity to interpose objections to the introduction of petitioner's evidence irregularly taken and introduced. The petitioner has been unwittingly drawn into a trap which denies him the benefit of his evidence on merely technical grounds. The principle announced in *Echols* v. *Tracewell,* 52 W. Va. 614, and in *Armstrong* v. *Grafton,* 24 W. Va. 50, is well adapted to situations of this kind and its application will enable the parties to have a fair trial under proper rulings by the court. On the theory of a misconception of the case by both counsel and the court, in consequence of which there had been no fair trial, the appellate court reversed the decrees in those two cases and remanded them. Viewed from this point of observation, the vice of the proceeding is the adoption of a wrong mode of trial and the application to the trial of improper rules of procedure.

That the case was heard on the agreement does not relieve from the effect of this irregularity. The parties reserved the right to make all proper objections to the pleadings and evidence, and under the rules governing the mode of trial adopted, no objections would have been entertained. Hence, it was useless to make any. We cannot assume that the appellee would have relied upon the want of a replication, or failed to object to the introduction of depositions, without grounds therefor having been shown, had he been informed that the trial was at law instead of in equity. He agreed that proof might be taken under the apprehension that the proceeding was governed by the rules of equity pleading and practice. This is manifest from the terms of the agreement. Therefore, he cannot be said to have consented to the use of the depositions on a trial at law, and, in fact, as well as, in law, the record shows there never was any such trial.

The position of counsel for appellant is open to another serious objection. The record does not show any express waiver of a jury by the appellee. The decision is in his favor. Appellant would reverse the decree and then have the court render, against the appellee, a new decree, such as, in the opinion of counsel for appellant, the court below should have entered. While an adjudication in favor of the appellee, without the waiver of a jury, might stand, because he cannot be prejudiced thereby, one against him might be fatally erroneous for want of such waiver. In decreeing against him this Court is bound to

notice and protect his rights. That a jury may be waived is beyond doubt, but the legislature has seen fit to prescribe the manner in which such waiver shall be shown, namely, by consent of the parties or their counsel entered of record. Section 29 of chapter 116 of the Code. This statute was put in the Code of 1849 upon the recommendation of the Revisors, at a time when the constitutional guaranty of jury trial was in a form different from that in which it now appears, but the alteration in its language makes it no less sacred, and our lawmakers have not exercised their discretion to dispense with the statutory requirement as to the manner in which such waiver shall be evidenced. Through all the mutations of our organic and other laws, they have suffered the statute to remain wholly unaltered, and its provisions have been uniformly observed down to the present time, so far as the reported decisions of this Court disclose. For more than half a century the statute has stood, working no inconvenience, and yet effectually guarding this most important and sacred right of the citizen against inadvertent and inconsiderate waiver. In view of all this, it would be clearly contrary to legislative intent, and a violent innovation upon our settled practice, to permit any form of waiver different from that prescribed by the statute. None of our decisions seem to countenance any authority in the court to try civil and misdemeanor cases except when the record shows a waiver by consent. *King* v. *Burdette,* 12 W. Va. 688; *Ramsburg* v. *Erb,* 16 W. Va. 777; *Bank* v. *Hamilton,* 43 W. Va. 75. In some jurisdictions there is a presumption of waiver when the record is silent on the subject. 17 Am. & Eng. Ency. Law, 1103, 1109; but, where the mode of waiver is prescribed by statute, that mode is generally held to be exclusive. 17 Am. & Eng. Ency. 1099.

In a trial upon the petition, it will be competent for a jury, or the court trying in lieu of a jury, to inquire into the *bona fides* of Horner's purchase. Fraud, if proven, will vitiate the sale, and it is within the legislative power to dispense with a plea or other specification setting it up by way of defense on the question of title. "It is as competent for a jury to investigate fraud as a chancellor; the evidence to sustain actual fraud must be the same, in substance and effect, in one forum that it is in another." *Baltimore &c. R. R. Co.* v. *Lafferty,* 2 W. Va. 104;

*Baltimore &c. R. R. Co.* v. *Lafferty,* 14 Grat. 478; *Jones* v. *Wood,* 16 Pa. St. 25; *Wilson* v. *R. R. Co.,* 11 Gill & J. 58.

For the reasons aforesaid, the decree must be reversed and the cause remanded for trial upon the petition of the appellant, Horner, in accordance with the principles herein stated, and, further, according to the rules and principles of equity.

*Reversed.*