[Civ. No. 3011. Second Appellate District, Division Two.—May 29, 1920.]

J. A. YOUNG et al., Appellants, v. NEW PEDRARA ONYX COMPANY et al., Respondents.

[Civ. No. 3053. Second Appellate District, Division Two.—May 29, 1920.]

J. A. YOUNG et al., Appellants, v. NEW PEDRARA ONYX COMPANY et al., Respondents.

[1] CORPORATIONS—TRANSFER OF SHARES—HOW EFFECTED.—A share of corporate stock, being an incorporeal right, incapable of manual delivery, the certificate being nothing more than evidence of its existence, in the absence of any controlling statutory inhibition, the shares, without an assignment or delivery of the certificate, may be assigned in any manner appropriate to the transfer of incorporeal personal property, as, for example, by a bill of sale, or any mode that will suffice to pass title to a chose in action or intangible property.

[2] ID.—ISSUANCE OF CERTIFICATES—MODE OF TRANSFER—SECTION 324, CIVIL CODE, CONSTRUED.—Section 324 of the Civil Code, which prescribes a mode by which the transfer of corporate stock may be made, is intended for the protection of the corporation and those who claim under the persons to whom the certificates were originally issued, but does not cover the whole subject of transfer, even where certificates have been issued.

48 Cal. App.—1        (1)

[3] ID.—AGREEMENT TO EXCHANGE STOCK — SUFFICIENCY TO PASS TITLE.—An agreement consisting of oral offer by an individual to a corporation to exchange all the stock in another corporation for all the stock of that corporation, accepted by the latter corporation; and immediately thereafter confirmed by the individual making the offer by a writing in which he recites that he thereby exchanges the capital stock of the one corporation for the capital stock of the other corporation, is sufficient, as between such individual and the corporation with which such contract was made, to transfer to the latter whatever interest such individual has in the stock of the other corporation.

[4] ID.—ORAL OFFER OF EXCHANGE—ACCEPTANCE—WRITTEN CONFIRMATION — EXECUTED CONTRACT.—The oral offer made by such individual to the corporation to exchange all the stock in another corporation for all the stock of that corporation, and the acceptance by the corporation of that offer, coupled with such individual's subsequent written confirmation of the exchange, was not an executory agreement to sell or to exchange, but was a completed or executed contract of exchange, whereby, as between the parties thereto, whatever title such individual had in the stock of the other corporation passed to and vested in the corporation with whom he entered into the contract.

[5] SALES—PASSING OF TITLE—INTENTION OF PARTIES.—In determining whether title has or has not passed, the primary consideration is one of intention, in each case the agreement being what the parties intended to make it, their intention to be gathered from the terms of the contract and such attendant circumstances as may legitimately be considered as evidencing the intention.

[6] ID.—DELIVERY NOT ESSENTIAL.—As between the parties, delivery is not essential to a contract of sale or exchange and the passing of title.

[7] CORPORATIONS—USE OF WORD "TRUSTEE" AFTER NAME OF STOCKHOLDER—EFFECT OF.—The addition of the word "trustee" after the name of a stockholder on the books of a corporation does not necessarily and alone raise an implication that such stockholder does not have the full right to deal with the stock as his own.

[8] ID.—SALE OF SHARES — INABILITY TO DELIVER ALL—RIGHTS AND DUTIES OF PARTIES.—Where a purchaser bargains for and purchases a given number of shares of the capital stock of a corporation, but the seller is not the owner of and therefore is unable to deliver the full number of shares, the purchaser, if he sees fit, can accept, in fulfillment of the contract, a lesser number of shares, and it does not lie with the seller to complain or to evade his obligation because he did not, or could not, comply strictly with his contract.

[9] ID.—PLEDGE OF STOCK—TRANSFER ON BOOKS NOT ESSENTIAL.—A transfer of stock upon the books of the corporation is not essential to the creation of a valid pledge.

[10] ID.—PURCHASE OF STOCK—NOTICE OF PRIOR PLEDGE—TITLE ACQUIRED.—If a purchaser of corporate stock has notice of a prior pledge thereof to a bank, the only title that passes to him is such as remained in the seller as pledgor, but if such purchaser has no notice of the pledge, or notice of circumstances sufficient to put a prudent person upon inquiry, he takes whatever title the seller has to the shares free and unencumbered by any claim of the bank as pledgee.

[11] SALES—EXECUTED CONTRACT—RESCISSION—RESTORATION OF TITLE. If a contract of sale or of exchange has been fully executed, and nothing remains to be done thereunder by either party thereto, the contract has fulfilled its purpose, and merely rescinding it by the mutual consent of the parties will not alone and *ipso facto,* in the absence of an intent to effect a restoration of title by reason of the rescission, restore to either of the parties that which he may have parted with under the fully executed contract.

[12] CORPORATIONS—RESOLUTION RESCINDING CONTRACT—INSUFFICIENCY TO RETRANSFER TITLE.—A resolution by the board of directors of a corporation rescinding a prior executed contract by which it acquired certain stock in another corporation and authorizing the officers of the corporation to execute and deliver all necessary documents to carry out the spirit and purpose of the resolution will not operate *ipso facto* to retransfer the title to the stock to the seller.

[13] ID.—OWNERSHIP OF STOCK—EQUITY—PLEADING—RELIEF AUTHORIZED—PARTIES.—Where in an equitable action involving, among other things, the ownership and proper registration of certain corporate stock, in which the plaintiffs pray for both general and special relief, and in which there is an answer to the complaint, the court may grant the plaintiffs any relief consistent with the case made by the complaint and embraced within the issues; and in such action it is error to grant a nonsuit as to one who is a proper, if not a necessary, party defendant.

[14] ID.—REGISTRY OF TRANSFER OF STOCK—EQUITY—PLEADING—PARTIES.—The true owner of stock may resort to a court of equity to compel the corporation to register on the books a transfer of the stock and to issue to him a new certificate; and in such an action it is proper to bring before the court as parties to the suit all persons having an interest in the stock, whether legal or equitable,

---

9. Validity of pledge or other transfer of stock of corporation when not made in books of company, as against attachments, executions or subsequent transfers, notes, 67 L. R. A. 656; 20 L. R. A. (N. S.) 996.

in order that they may be bound by the decree, and further litigation prevented.

[15] ID.—ABSENCE OF NECESSARY PARTY—DUTY OF COURT TO ORDER IN.—Where in such an action it appears that the presence of a given bank, as claimant of a pledgee's special property in the stock, is necessary to a complete determination of the controversy, the trial court, *sua sponte,* should make an order under section 389 of the Code of Civil Procedure, directing the bank to be brought into the action as a party defendant.

APPEALS from judgments of the Superior Court of San Diego County. C. N. Andrews, Judge. Reversed.

The facts are stated in the opinion of the court.

Bischoff & Thompson for Appellants.

Sam Ferry Smith, *in pro. per.,* F. W. Stearns, Laurence Hammond Smith, Eugene Ferry Smith and J. C. Hizar for Respondents.

FINLAYSON, P. J.—Plaintiffs, stockholders of the New Pedrara Mexican Onyx Company (hereafter referred to as the California company), suing on behalf of that corporation, brought this action to set aside a certain resolution adopted by the company's board of directors on June 27, 1911, whereby, so it is claimed, the board rescinded a transfer to the company of certain shares of the capital stock of another corporation, hereafter, for convenience, referred to as the Mexican Company. There are two appeals, each upon a separate record. Both appeals are from judgments in the same case.

These two appeals were decided and opinions filed on December 10, 1919. Thereafter, on petition of appellants, a rehearing was granted in each case. The appeal in case No. 3053 is from a judgment of nonsuit entered August 13, 1915, in favor of defendants Smith, Lea, and the Pedrara Onyx Company (hereafter referred to as the Arizona company), and the appeal in case No. 3011 is from a judgment on the merits, entered February 4, 1916. Both appeals will be treated in one opinion.

Our *résumé* of the principal facts, gleaned in part from the findings and in part from the evidence, will suffice

for an understanding of the questions presented. It may be that, as to some of the facts set forth in our statement of the case, there is a conflict in the evidence. Needless to say, nothing that may be said by us should be regarded as a foreclosure of the trial court's exclusive right to decide, according to the evidence, governed by the exercise of its own sound judgment, any controverted fact that may be presented on the retrial of any issue that may properly be the subject of a new trial upon the case being remanded.

The material facts of the case are these: Some time prior to July 3, 1906, the New Pedrara Onyx Company (the company herein referred to as the Mexican company) was incorporated under the laws of this state with a capital stock of ten thousand dollars, divided into one hundred shares of the par value of one hundred dollars each. Immediately upon its organization all of its shares were issued, one share to each of the company's five directors—one of whom was the defendant L. A. Blochman—and the balance, ninety-five shares, to ''L. A. Blochman, Trustee.'' All of the one hundred shares stood upon the books of the Mexican company in the names of these five persons until June 29, 1911, when they were transferred to the name of Pedrara Onyx Company, the corporation herein referred to as the Arizona company.

Shortly after the organization of the Mexican company, and prior to July 3, 1906, the one hundred shares of the Mexican company's capital stock were pledged to the Blochman Banking Company to secure an indebtedness due to it. The bank is not a party to the action. When this pledge was made the certificates evidencing the one hundred shares were indorsed and delivered to the bank as pledgee, but the transaction was not noted on the records of the Mexican company in any manner whatever; and, so far as the books of that company show, the five original shareholders continued to be the record owners of the one hundred shares until June 29, 1911, until which date one share stood on the books of the Mexican company in the name of L. A. Blochman and ninety-five shares in the name of ''L. A. Blochman, Trustee.''

The New Pedrara Mexican Onyx Company (the California company) was incorporated shortly prior to July 3, 1906. It was incorporated with a capital stock of one

million dollars, divided into one hundred thousand shares of the par value of ten dollars each. Its shares were divided into preferred and common stock—twenty-five thousand shares of preferred and seventy-five thousand shares of common stock. Plaintiffs are holders of some of the shares of the capital stock of the California corporation, and, as we have said, they are prosecuting this action in its behalf.

Blochman was elected president of the California company at the first meeting of its board of directors, held July 3, 1906. At this first meeting—the certificates evidencing the one hundred shares of the Mexican company still remaining in the hands of the bank as pledgee, but the shares evidenced thereby still being registered on the books of the Mexican company in the names of the five original subscribers—Blochman, so the minutes of the California company show, orally offered to sell and deliver to the California company the entire capital stock of the Mexican company, one hundred shares, and receive in exchange therefor the entire capital stock of the California company —one hundred thousand shares. This offer, so the minutes show, was immediately accepted by the California company's board of directors. Thereupon, after the acceptance of Blochman's offer to exchange the one hundred shares of the Mexican company for the one hundred thousand shares of the California company, Blochman offered to give to the California company the optional right to repurchase all of its twenty-five thousand shares of preferred stock and twenty-three thousand shares of its common stock for the sum of one hundred and sixty thousand dollars, payable at any time within two years. This offer was immediately accepted by the California corporation, and thereupon the first vice-president and secretary of the California company were authorized and directed to enter into a contract with Blochman in accordance with his offer to give such optional right to repurchase said shares for one hundred and sixty thousand dollars.

Four days thereafter, viz., on July 7, 1906, a written instrument, subscribed by Blochman, was delivered by him to the California company. By this instrument, Blochman, in effect, confirmed his previous oral offer to exchange all of the capital stock of the Mexican company for the stock of

the California company. This instrument, so far as material, is as follows: " . . . L. A. Blochman, of San Diego, California, hereby exchanges and agrees to transfer at once one hundred shares of the New Pedrara Onyx Company [the Mexican company] . . . for twenty-five thousand (25,000) shares of the preferred stock and seventy-five thousand (75,000) shares of the common stock of said latter company [the California company], being all of the stock of said company." Then follows a paragraph in relation to the optional right of the California company to repurchase its shares for one hundred and sixty thousand dollars, and a further paragraph whereby Blochman agrees to deliver as many shares of the stock of the California company as that company should sell, provided he be paid eight dollars on each share sold by the company, less the cost of sale, the same to be credited on the purchase price of one hundred and sixty thousand dollars. Immediately thereafter certificates for all the shares of the California company's capital stock were made out in the name of Blochman, but remained in the manual possession of that corporation. As the California company's stock was sold to others at eight dollars per share, certificates for the shares so sold were issued and delivered to the purchasers, among whom are these plaintiffs. The trial court found that the California company neglected to pay to Blochman the proceeds of the shares so sold by it, but, instead, used the money in the conduct of its business.

The property of the Mexican company consisted almost entirely of certain onyx quarries in Mexico. From the date of the exchange of the California company's shares for those of the Mexican company, the directors and stockholders of the former seem to have treated that company as the owner of the quarries and of all onyx quarried therefrom, although it is alleged in the complaint—and we think the allegation is a correct conclusion from the facts of the case—that "said Mexican company, at all times mentioned in the complaint, was and still is the owner of five thousand acres of land in Lower California in which are situated the quarries of onyx known as the Pedrara Onyx Quarries."

On June 27, 1911, at a meeting of the board of directors of the California company, Blochman presented to that company the following written communication:

"New Pedrara Mexican Onyx Company,
    "City.

"Gentlemen:

"On July 3rd, A. D. 1906, your corporation made an agreement with me wherein and whereby I was to transfer to your corporation all of the capital stock of the New Pedrara Onyx Company [the Mexican company] for the sum of One Hundred and Sixty Thousand ($160,000) Dollars, and in order to carry said purchase into effect I was to transfer to your corporation all the stock of the New Pedrara Onyx Company [the Mexican company] in exchange for all the capital stock of your corporation, and I was then to give you an option to purchase all of the stock of your Corporation transferred to me for the sum of One Hundred and Sixty Thousand ($160,000) Dollars. Your Corporation has sold 3200 shares of preferred stock and 2564 shares of common stock, but nothing has been paid to me on said option and no consideration has been paid to me for the transfer of the stock of the New Pedrara Onyx Company [the Mexican company]. Your Corporation has used from the quarries onyx to the value of more than Ninety Thousand ($90,000.00) Dollars, and have paid nothing to me or the New Pedrara Onyx Company [the Mexican company] therefor. This condition certainly cannot continue much longer. I therefore give you notice that I rescind said contract for the sale of said stock of the New Pedrara Onyx Company [the Mexican company] to your corporation for the said sum of One Hundred and Sixty Thousand ($160,000.00) Dollars, and herewith tender you all of the stock of the Corporation [the California company] save and excepting such as you yourself have sold out of the same, and demand of you the immediate transfer to me of all the capital stock of the New Pedrara Onyx Company [the Mexican company] and the payment to me of the sum of Ninety Thousand ($90,000.00) Dollars for the Onyx used from said quarries; or if you prefer, I will make you this alternative proposition; I will relinquish all claim to the 3200 shares of preferred stock and the 2564 shares of common stock sold by you; I will accept stock in part payment of said Ninety Thousand ($90,000.00) Dollars, and will close matter on the following basis: You surrender to me the stock of the New Pedrara Onyx Com-

pany [the Mexican company], pay me Five Thousand ($5,000.00) Dollars in cash and issue to me 9000 shares of capital stock of your Corporation [the California company], and I will surrender to you all the remainder of said stock, to wit: 72,436 shares of common stock and 12,300 shares of preferred stock. This last proposition will enable your corporation to continue business in fine shape. I will also surrender to your Corporation all claim to all onyx on storage in all other parts of the United States, save and excepting the onyx now in your bonded yard. This onyx is the property of the New Pedrara Onyx Company [the Mexican company] and you must release all claim thereto.

"Trusting that this proposition will meet with your favorable consideration, I am,

"Sincerely yours,
"L. A. Blochman."

It will be noticed that this communication from Blochman to the California company's board of directors misstated the terms and effect of the contract that had been made on July 3, 1906. That contract, so the court found, was not an agreement by Blochman to transfer or sell to the California company the stock of the Mexican company for one hundred and sixty thousand dollars, but was a contract of exchange, whereby Blochman had exchanged the shares of the Mexican company for all the capital stock of the California company, and then gave the California company the optional right to repurchase its own stock for one hundred and sixty thousand dollars.

Immediately upon the presentation of Blochman's communication of June 27, 1911, the board of directors of the California company adopted a resolution that purports to rescind the contract which, in Blochman's communication, is assumed to be the contract that he had made with the California company on July 3, 1906. In our future references to this resolution we shall refer to it as the "rescinding resolution of June 27, 1911." In this resolution of rescission, or purported rescission, after certain recitals in the preamble, not necessary to be set forth here, the California company's board of directors resolved "that the contract made and entered into on the 3rd day of July, A. D. 1906, for the sale by L. A. Blochman to this corpo-

ration, and the purchase by this corporation of all the stock of the New Pedrara Onyx Company [the Mexican company] be rescinded, and said stock be redelivered to the said L. A. Blochman; and that, in addition thereto, the said L. A. Blochman be paid the sum of Five Thousand ($5000.00) Dollars, lawful money of the United States; and that the said L. A. Blochman is to release all claim to the 3200 shares of preferred stock and 2564 shares of common stock heretofore issued; and that there be issued to the said L. A. Blochman in payment of the onyx used from the quarries of the New Pedrara Onyx Company [the Mexican company] during the time that said contract has been in existence, 9000 shares of the preferred stock of this corporation." This resolution further provided that "the officers of this corporation be authorized to make, execute and deliver all the necessary documents of every kind, nature and description to carry out the purpose and spirit of this resolution, and to carry into effect the transfer of the stock of the New Pedrara Onyx Company [the Mexican company], and the onyx belonging to it, to the said L. A. Blochman."

It is alleged in the complaint that the board of directors of the California company was induced to adopt this resolution of rescission by reason of certain false and fraudulent representations alleged to have been made by defendants Blochman, Smith, and Lea, and certain false promises alleged to have been made by them without any intention of performance. As we view the case, the inducements that prompted the board of directors to adopt the rescinding resolution of June 27, 1911, are not material, because, for reasons stated *infra,* we think that, fraud or no fraud, the rescinding resolution did not divest the California company of any title that may have been received by it under the contract of exchange made July 3, 1906.

Though the board of directors of the California company, by this resolution of June 27, 1911, resolved that the officers of that corporation be authorized "to make, execute, and deliver all the necessary documents of every kind, nature and description to carry out the purposes and spirit of this resolution," no attempt seems to have been made to carry out the resolution by the payment of any money to Blochman, or by the retransfer to him, or to anyone for

him, of any of the shares of the capital stock of the Mexican company, or by the transfer to him of any property owned or claimed by the California company. In short, the "rescission," assuming for the present that the board's resolution of June 27, 1911, was effective as a rescission of the contract of exchange that had been made on July 3, 1906, was not carried out by any attempt to redeliver or retransfer or reassign the stock that, it is claimed, Blochman, on July 3, 1906, had assigned to the California company in exchange for all the shares of that company's capital stock.

Shortly prior to the adoption by the California company's board of directors of the rescinding resolution of June 27, 1911, the Arizona company was incorporated and organized. And on June 29, 1911, the one hundred shares of the capital stock of the Mexican company, for the first time since their issuance to the five original subscribers, were transferred on the books of the Mexican company— the transfer being made on the books of that company to the Arizona company, as the transferee, the certificates meanwhile remaining in the possession of the Blochman Banking Company, as pledgee.

The trial court found that "the said one hundred (100) shares of stock of the New Pedrara Onyx Company [the Mexican company] were not delivered to said New Pedrara Mexican Onyx Company [the California company], but, on the contrary, were at said time and at all times thereafter held by the Blochman Banking Company as pledgee to secure indebtedness due it from W. R. Ramsdell and other persons, and the title to said one hundred (100) shares did not pass to said New Pedrara Mexican Onyx Company [the California Company] by the contract between said L. A. Blochman and said company, set forth above, arising out of the meeting of July 3, 1906." In its conclusions of law the trial court found that Blochman's agreement to exchange the one hundred shares of the Mexican company's capital stock for all of the shares of the California company never became effective, "for the reason that said stock was not in the possession of said L. A. Blochman and was not delivered to the said New Pedrara Mexican Onyx Company [the California company] or to anybody in their behalf, but was at all times in the custody and possession

of the Blochman Banking Company as pledgee to secure an indebtedness due and owing it by W. R. Ramsdell.''

The record before us is vague as to how or by whom the one hundred shares of the Mexican company's capital stock were transferred on the books of that company to the Arizona company. If the stock has been sold by the bank as pledgee, at a pledgee's sale, regularly conducted, and to an innocent purchaser for value and without notice, and thus has come into the possession of the Arizona company, it may be that that corporation has received an unimpeachable title to the one hundred shares, freed from all claim on the part of the California company. As to this, however, the record before us furnishes no information, and we have no means of knowing what is the basis of the Arizona company's assertion of title, save this, that defendants, in their answers, allege that ''on or about the twenty-ninth day of June, 1911, said Blochman, for a valuable consideration to him moving, sold, assigned, and transferred all his rights in and to said stock and the whole thereof to the Pedrara Onyx Company, hereinbefore designated as the Arizona corporation, and caused a delivery thereof to be made to said last-named corporation, and said stock was transferred on the books of said Mexican corporation to said Arizona corporation.''

As already stated, the trial court, after plaintiffs had introduced their evidence and rested, granted a nonsuit in favor of defendants Smith, Lea and the Arizona company. From the formal judgment of nonsuit, entered August 13, 1915, plaintiffs have appealed. After the entry of the judgment of nonsuit, the case was continued as to the remaining defendants—the Mexican company, the California company, on whose behalf the suit is being prosecuted, and Blochman; and on February 4, 1916, a judgment on the merits was entered as to these last-named defendants. By this judgment the trial court adjudged and decreed: (1) That plaintiffs take nothing as to the Mexican company; (2) that the California company did not acquire or become the owner of the one hundred shares of the capital stock of the Mexican company, by virtue of the transaction of July 3, 1906, between it and Blochman; (3) that the rescinding resolution of June 27, 1911, adopted by the board of directors of the California company, was illegal and void,

and that it be set aside and declared void as to the defendant Blochman; (4) that defendant Blochman did not receive anything of value by reason of the transaction at the meeting of the board of directors of the California corporation on June 27, 1911, and that, therefore, plaintiffs and the California company take nothing as against the defendant Blochman; and (5) that plaintiffs recover their costs against the California corporation. Plaintiffs appeal from this judgment.

The principal question presented for our decision is this: Did the California company, by reason of its acceptance of Blochman's oral offer to exchange the one hundred shares of the Mexican company's capital stock for all the shares of the California company, and Blochman's subsequent written confirmation of the exchange, acquire any title to or interest in the one hundred shares of the Mexican company's capital stock?

For the purposes of these appeals, it may be assumed that the California company did not acquire any title to the four shares that had been issued by the Mexican company to Blochman's four codirectors. As to the remaining ninety-six shares, the California company, like the purchaser of any kind of personal property, could waive the efficiency in quantity and elect to receive and hold the ninety-six shares that stood in Blochman's name—the one that stood in his name individually and the ninety-five that stood in his name as trustee. Did the California company acquire any title to these ninety-six shares of the capital stock of the Mexican company? If it did, then as to at least three of the defendants, the three corporations, the judgment must be reversed and the cause remanded for a retrial of the issues respecting the ownership of this stock.

Respondents contend: (1) That because the stock certificates were held by the Blochman Banking Company as pledgee, and Blochman did not indorse and deliver the certificates to the California company, the attempted exchange of stock was a nullity; (2) that Blochman's offer of July 3, 1906, and the California company's acceptance thereof, was not an executed contract of exchange but only an executory agreement to exchange, under which no title passed; and (3) that Blochman did not own the stock of

the Mexican company. In our opinion none of these contentions is tenable.

[1] Shares of stock are personal property, and there is no reason why, *as between the parties,* they cannot be transferred as any other personal property. Shares in a corporation are a species of incorporeal property. They exist independently of any certificate. And though it is not uncommon to hear persons speak of the certificate itself as the "stock," nevertheless, the certificate that evidences the shares is but the paper representative of the *incorporeal* right, and stands on a footing similar to that of other muniments of title. It is not in itself the property, but is merely the symbol or paper evidence of the property, and the property right may exist without the certificate. A share of stock being an incorporeal right, incapable of manual delivery, and the certificate being nothing more than evidence of its existence, it is obvious that, in the absence of any controlling statutory inhibition, the shares, without an assignment or delivery of the certificate, may be assigned in any manner appropriate to the transfer of incorporeal personal property, as, for example, by a bill of sale, or any mode that will suffice to pass title to a chose in action or intangible property. The *jus disponendi* in shares of stock is an incident of ownership, and may be exercised in any manner not prohibited by law. (*Lipscomb* v. *Condon,* 56 W. Va. 416, [107 Am. St. Rep. 938, 67 L. R. A. 670, 49 S. E. 392].)

[2] But, say counsel for respondents, where, as here, certificates, evidencing title to the shares, have been issued, section 324 of the Civil Code prohibits a transfer by any mode other than by an indorsement and delivery of the certificates. That section reads: "Whenever the capital stock of any corporation is divided into shares, and certificates therefor are issued, such shares of stock, except as hereinafter provided, are personal property, and may be transferred by indorsement by signature of the proprietor, . . . and delivery of the certificate; but such transfer is not valid, except as to the parties thereto, until the same is so entered upon the books of the corporation as to show the names of the parties by whom and to whom transferred, the number of the certificate, the number or denomination of the shares, and the date of the transfer."

This section of the code is intended for the protection of the corporation and those who claim under the persons to whom the certificates were originally issued. The section clearly does not cover the whole subject of transfer. Corporate stock would be transferable without such provision as that contained in this particular code section. (Civ. Code, sec. 1044.) Says the court in *Riverside Land Co.* v. *Jarvis,* 174 Cal. 327, [163 Pac. 54], speaking through Mr. Justice Shaw: ''The provision merely prescribes a mode by which the transfer may be made. It does not prohibit a transfer by other methods, nor declare that when made in another manner a transfer may not be enforced by the party entitled to the shares.'' This language of the court accords with the generally accepted rule that if a mode of assignment is provided by statute, such statutory mode is cumulative, in the absence of express words inhibiting other modes of assignment. (*Gardner* v. *Mobile etc. R. R. Co.,* 102 Ala. 635, [48 Am. St. Rep. 84, 15 South. 271]; 5 Corpus Juris, 898, 899.) For these reasons we are satisfied that even where, as here, certificates have been issued, a transfer of title, good as between the parties thereto, may be made in manner other than that recognized as a lawful mode of transfer by section 324; that a transfer of title, good as between the parties, may be made in any manner appropriate to the assignment of choses in action or intangible personal property, **[3]** and that the mode adopted by the California company and Blochman on July 3, 1906, confirmed by Blochman's written instrument of July 7, 1906, was sufficient, as between the parties thereto, to transfer to the California company whatever title Blochman may then have had in the one hundred shares, or any of them. It may be that the legal title did not pass. As to this it is not necessary to express an opinion. But if the legal title did not pass, the full equitable title did, subject, of course, to the special property that had previously vested in the pledgee, if, as claimed by respondents, the California company, at the date of the contract of exchange, had notice, actual or constructive, of the prior pledge to the Blochman Banking Company. (*Riverside Land Co.* v. *Jarvis, supra; Tregear* v. *Etiwanda W. Co.,* 76 Cal. 537, [9 Am. St. Rep. 245, 18 Pac. 658]; *Johnson* v. *Kirby,* 65 Cal. 482, 486, [4 Pac. 458]; *Lipscomb* v. *Condon, supra; Hubbard* v.

*George,* 81 W. Va. 538, [L. R. A. 1918C, 835, 94 S. E. 974]; *Manchester St. Ry. Co.* v. *Williams,* 71 N. H. 312, [52 Atl. 461]; *Baldwin* v. *Canfield,* 26 Minn. 43, [1 N. W. 261, 276]; *Prince Inv. Co.* v. *St. Paul etc. L. Co.,* 68 Minn. 121, [70 N. W. 1079]; *Colton* v. *Williams,* 65 Ill. App. 466; *Richardson* v. *Longmont etc. Co.,* 19 Colo. App. 490, [76 Pac. 546]; *Equitable Securities Co.* v. *Johnson,* 36 Colo. 377, [85 Pac. 840]; *Grymes* v. *Home,* 49 N. Y. 17, [10 Am. Rep. 313]; *Curtis* v. *Crossley,* 59 N. J. Eq. 358, [45 Atl. 905].) Though not all the cases we have cited are directly in point, all lend support to the conclusion at which we have arrived.

[4] Blochman's offer of July 3, 1906, to exchange the one hundred shares of the Mexican company's capital stock for all the shares of the California company, and the California company's acceptance of the offer, coupled with Blochman's written confirmation of the exchange on July 7, 1906, was not an executory agreement to sell or to exchange, but was a completed or executed contract of exchange, whereby, as between the parties to the exchange, whatever title Blochman possessed passed to and vested in the California company.

There was an unconditional offer to exchange and an immediate and unequivocal acceptance of that offer. Upon the acceptance of the offer a completed contract came into being. That contract, in our opinion, was a contract of exchange, not a contract to exchange. "The provisions of the title on sale apply to exchanges." (Civ. Code, sec. 1806.) "The title to personal property, sold or exchanged, passes to the buyer whenever the parties agree upon a present transfer, and the thing itself is identified, whether it is separated from other things or not." Here the "thing" exchanged, stock of the Mexican company, was identified. Did the parties agree upon a present transfer? [5] In determining whether title has or has not passed, the primary consideration is one of intention. In each case the agreement is what the parties intended to make it. Their intention is to be gathered from the terms of the contract and such attendant circumstances as may legitimately be considered as evidencing the intention. Certain rules have been established for determining whether a contract is a contract of sale or an agreement to sell—rules that are ap-

plicable to exchanges as well· as to sales. These rules are well stated by the United States supreme court in the *Elgee Cotton Cases,* 22 Wall. 180, 188, [22 L. Ed. 863, see, also, Rose's U. S. Notes]. Two of these rules have no application here, as they refer to those steps necessary to put the property into a deliverable state, or a determination of the price by weighing, measuring, and testing. The third only is significant. It is there stated in these words: "Where the buyer is by the contract bound to do anything as a condition, either precedent or concurrent, on which the passing of the property depends, the property will not pass until the condition be fulfilled, even though the goods may have been actually delivered into the possession of the buyer." Here the contract of exchange did not require either party to do anything, precedent or concurrent, on which the passing of the property was to depend. Nothing remained to be done by Blochman. He had ninety-six shares standing on the books of the Mexican company in his name—one in his name individually and· ninety-five in his name as trustee. These ninety-six shares he, presumably, could have had transferred on the books of the Mexican company to the name of the California company, even if it would be necessary to cause the transfer to show that it was made subject to the prior pledge to the bank. [6] As between the parties, delivery is not essential to a contract of sale or exchange and the passing of title. (*Driscoll v. Driscoll,* 143 Cal. 528, [77 Pac. 471]. See, also, *Burkett v. Doty,* 32 Cal. App. 337, [162 Pac. 1042].)

Mr. Benjamin states the rule to be that "the presumption of law is that the contract is an actual sale, if the specific thing is agreed on, and it is ready for immediate delivery." (Benjamin on Sales, 7th ed., sec. 311.) "When there has been no manifestation of a contrary intention, the presumption of law is that the contract is an actual sale, and that the transfer of title takes place at once in advance of actual delivery, if the thing is agreed on, and is ready for immediate delivery." (24 Am. & Eng. Ency. of Law, 2d ed., p. 1051.) Mr. Cook states the law thus: "Generally the sale of stock is attended with an immediate delivery of the certificates therefor, or it is agreed that the certificate shall be delivered at some specific time in the future. If, however, the vendor offers to sell his stock and

the vendee accepts the offer, the contract is complete and binds both parties, although nothing has been said as to the time when the certificate of stock shall be delivered.''

Further than this, Blochman, on July 7, 1906, by what we have called his written confirmation of the contract of exchange, uses language that unmistakably indicates his intention that the transaction should constitute an exchange *in praesenti*. He says: '' . . . L. A. Blochman, of San Diego, Cal., *hereby exchanges* and agrees to transfer *at once* one hundred shares of the [Mexican company] . . . being all of the stock of said company.'' The language ''L. A. Blochman . . . hereby exchanges'' is not the language of an executory contract to exchange. It is the language of an executed contract of exchange, whereby an instant and immediate transfer of title is effected. It is true the words ''hereby exchanges''—words importing a transfer *eo instanti*—are followed by the words ''and agrees to transfer at once''—words that look to action in the future, even though it be the immediate future. However, the two expressions, one importing present action and the other looking to immediate future action, are in nowise inconsistent. For, without doubt, the word ''transfer,'' used in the phrase ''agrees to transfer at once one hundred shares,'' was intended by the parties to refer to a transfer on the books—a transfer or registration to be made ''at once,'' in order that the exchange, already effected in fact and good as between the parties, might become effective as to all the world.

Moreover, Blochman, in his confirmatory writing of July 7, 1906, further says that he ''also sells'' to the California company ''the option to purchase twenty-five thousand shares of the preferred stock and seventy-two thousand three hundred shares of the common stock'' of that company for one hundred and sixty thousand dollars. By thus giving the California company the option to repurchase its shares for a stated sum, Blochman treated himself as the owner of the stock that he was to get in the exchange, thus showing that he understood that there already had been consummated an executed and completed contract of exchange whereby he had become the owner of the California company's capital stock, and, as such owner, could give that company an optional right to repurchase. Indeed, the

whole course of conduct of the parties, at the date of the exchange and for a considerable period of time thereafter, points unerringly to the fact that it was their intention that the contract, from the time it was consummated by the California company's acceptance of Blochman's offer, should be an executed contract of exchange, under which title passed from one party to the other. The foregoing reasoning and our conclusion that, as between the parties, there was a present transfer of title, find support in the following authorities: *Mason* v. *Lievre*, 145 Cal. 514, [78 Pac. 1040]; *Majors* v. *Girdner*, 31 Cal. App. 47, [159 Pac. 826]; *Beardsley* v. *Beardsley*, 138 U. S. 262, [34 L. Ed. 928, 11 Sup. Ct. Rep. 318, see, also, Rose's U. S. Notes]; *State* v. *Whited*, 104 La. 125, [28 South. 922].

There is no merit in the contention that at the date of the exchange, July 3, 1906, Blochman did not own any of the stock of the Mexican company. Without doubt he owned, at that time, the one share that stood on the books of the company in his name, subject, of course, to any right the Blochman Banking Company may have possessed as pledgee. [7] As to the ninety-five shares that stood in the name of "L. A. Blochman, Trustee," the addition of the word "Trustee" does not necessarily and alone raise an implication that Blochman did not have the full right to deal with the stock as his own. (*Brewster* v. *Sime*, 42 Cal. 139; *Thompson* v. *Toland*, 48 Cal. 99; *Northwestern P. C. Co.* v. *Atlantic P. C. Co.*, 174 Cal. 308, [163 Pac. 47].) [8] The fact that four of the shares of the Mexican company's capital stock were owned by other parties and that but ninety-six of the one hundred shares stood in Blochman's name, either individually or as trustee, affords no reason for holding that title to none of the shares passed to the California company. If, under the contract of exchange, the California company could have insisted that it had bargained for and purchased all of the one hundred shares, nevertheless, if it saw fit, it could accept, in fulfillment of the contract, fewer than one hundred shares, and it would not lie with Blochman to complain or to evade his obligation because he did not, or could not, comply strictly with his contract. (*Dennison* v. *Chapman*, 105 Cal. 447, 454, 455, [39 Pac. 61].)

[9] The trial court found that all of the one hundred shares had been pledged to the Blochman Banking Company. If, as that court found, this pledge was made to the bank, then when the pledge was made the bank, to whom all the certificates had been delivered as pledgee, became vested with a legal interest, a "special property," notwithstanding the pledge was not entered on the books of the Mexican company. (*Northwestern P. C. Co.* v. *Atlantic P. C. Co., supra; Fowles* v. *National Bank,* 167 Cal. 658, [140 Pac. 271].) "It is not the law of this state, nor is it the law generally, that a transfer upon the books of the corporation is essential to the creation of a valid pledge." (*Spreckels* v. *Nevada Bank,* 113 Cal. 272, 278, [54 Am. St. Rep. 348, 33 L. R. A. 459, 45 Pac. 329].)

This pledge was good as against the California company, a subsequent purchaser, if the latter had notice of the pledge at the time when it and Blochman effected the exchange of shares on July 3, 1906. (*Weston* v. *Bear River etc. Co.,* 6 Cal. 425; *Spreckels* v. *Nevada Bank, supra* (p. 276); *Seymour* v. *Salsberry,* 177 Cal. 755, [171 Pac. 938].) The trial court made no finding upon the question of notice to the California company of the prior pledge to the Blochman Banking Company. Upon this question of notice there is a decided conflict in the evidence. Two witnesses for defendants, Smith and Blochman, testified positively that, at the first meeting of the board of directors of the California company, the directors of that company were told that the one hundred shares of the Mexican company had been pledged to the Blochman Banking Company to secure an indebtedness due the bank. This was as flatly denied by witnesses for the plaintiffs. Aside from the direct evidence of actual notice to the California company, as given by defendants' witnesses, the trial court could have weighed and considered any circumstances tending to impart constructive notice to the California company. Whether such circumstances, if any there be, were sufficient to put that company on inquiry and thus impart notice to it, as a subsequent assignee, was, and on any retrial will be, a question of fact for the trial court. (*Northwestern P. C. Co.* v. *Atlantic P. C. Co., supra.*)

[10] From the foregoing it follows that if, at the date of the exchange, July 3, 1906, the California company had

notice of the prior pledge to the Blochman Banking Company, then the only title that passed to the California company was such as remained in Blochman as pledgor. On the other hand, if the California company did not have notice of the pledge, or notice of circumstances sufficient to put a prudent person upon inquiry, it took whatever title Blochman had to the shares free and unencumbered by any claim of the bank as pledgee. In either case, however, the California company would receive some title under its contract of exchange with Blochman. For, even if that company did take the one hundred shares, or any one of them, subject to the prior pledge to the bank and subject to the special property vested in the bank as pledgee, still the general property would remain in the pledgor, and that general property, to the extent that it was vested in Blochman at the date of the exchange, July 3, 1906, would, in that case, pass to the California company.

For these reasons, we conclude. that the court erred in finding, as it did, that no title to the shares of the Mexican company passed to the California company by reason of the contract of exchange whereby Blochman, on July 3, 1906, exchanged the Mexican company's shares for all of the stock of the California company.

It will be the duty of the trial court, on a retrial of the question of ownership, to determine just what title, if any, did pass to the California company. If the one hundred shares were pledged, as claimed by defendants, and if, at the date of the contract of exchange, July 3, 1906, the California company had actual notice of such pledge, or actual notice of circumstances sufficient to put a prudent person upon inquiry, so that by prosecuting such inquiry such person might have learned of the pledge, then, on such retrial, the court should find that, as between Blochman and the California company, the latter became vested with title to such shares as Blochman owned, subject, however, to the prior pledge and the right of the pledgee to sell and convey to a purchaser, at a pledgee's sale, full title to so much of the stock as might be necessary to satisfy the indebtedness secured by the pledge. If, on the other hand, the court shall find that there was no pledge, or that the California company had no notice thereof, actual or constructive, then, on such retrial, it will be the duty of the court to find that,

as between Blochman and the California company, the latter took title to all shares owned by Blochman, unencumbered by any prior pledge to the Blochman Banking Company. It also will be necessary, on such retrial, to determine whether the Arizona company was an innocent .purchaser, for value and without notice, either from the pledgee, under a pledgee's sale, or otherwise. If it was an innocent purchaser, for value and without notice, then the Arizona company, as between it and its transferor, would acquire the title—a title unencumbered and free of all prior assignments of which it had no notice, actual or constructive.

It does not necessarily follow from the foregoing that plaintiffs are entitled to relief as against all the defendants, or even all the relief prayed for as against any of the defendants, even if it be a fact that the California company, under its contract of exchange with Blochman, became vested with some title to the one hundred shares. By their complaint plaintiffs pray that the rescinding resolution of June 27, 1911, be annulled. This relief was granted. The judgment declares that "the transaction entered into by the board of directors" of the California company and Blochman "on the twenty-seventh day of June, 1911, was illegal and void," and adjudges that it be and is "set aside and declared void." Plaintiffs, by their complaint, also pray that Blochman, Smith, Lea, and the Arizona company be required to account for everything received by them under the rescinding resolution of June 27, 1911. This claim rests upon the erroneous theory that the one hundred shares, or property of some kind, repassed from the California company to Blochman as a necessary result of the rescinding resolution of June 27, 1911. This is an untenable theory. No shares of stock, or rights of any kind, that may have passed to the California company under the contract of exchange of July 3, 1906, could or did revest in Blochman by reason of the rescinding resolution of June 27, 1911, though many of appellants' claims are based upon the erroneous assumption that, by this rescinding resolution, the California company was wrongfully deprived of valuable property rights.

In the first place, notwithstanding Blochman's written notice of rescission on June 27, 1911, and the board's consent thereto, as expressed in the resolution complained of,

appear, upon their face, to constitute a mutual rescission of a contract that had been entered into by Blochman and the California company on July 3, 1906, it is at least doubtful if the transaction of June 27, 1911, can be regarded as a rescission, or even an attempted rescission, of the contract of exchange found by the trial court to be the contract that actually was made on July 3, 1906. By his written communication of June 27, 1911, Blochman, after reciting that, on July 3, 1906, he had contracted to transfer to the California company all of the stock of the Mexican company for the sum of one hundred and sixty thousand dollars, proceeds to say that he gives notice that he rescinds "said contract for the sale of said stock . . . for one hundred and sixty thousand dollars." The board acted upon this notice of rescission by adopting the resolution of June 27, 1911, wherein it is recited that the board consents to a rescission of "said contract." There seems, therefore, to be ground for the contention that the transaction of June 27, 1911—the transaction evidenced by Blochman's written notice that he rescinds a contract for the sale of the shares of the Mexican company for one hundred and sixty thousand dollars, and the California company's resolution consenting to such rescission—was but an attempted rescission of a phantom contract, a contract that never was made. According to the court's findings, the contract that actually was made on July 3, 1906, was not the contract recited in Blochman's notice of rescission or in the board's resolution consenting thereto, but an entirely different contract.

But even if, for the purposes of this decision, we assume that, by the transaction of June 27, 1911, Blochman and the board of directors of the California company did mutually agree to rescind the contract that actually was made on July 3, 1906—the executed contract of exchange—nevertheless, that alone would not suffice to revest Blochman with title to the stock or with any property right that might be an incident of title to the stock. It appears from the resolution adopted by the board that it was the intention of the parties that something more than Blochman's mere notice of rescission and the board's consent thereto should be necessary before Blochman was to be revested with title to the stock. The board, by what we have termed the

"rescinding resolution of June 27, 1911," resolved that "the officers of this corporation be authorized to make, execute and deliver all the necessary documents to carry out the purpose and spirit of this resolution." No actual or manual redelivery of the shares to Blochman was possible; such intangible property cannot be the subject of manual delivery. No constructive or symbolical redelivery of the shares by delivery of the certificates was possible, for the California company held no certificate of stock that it could redeliver to Blochman. The certificates were in the possession of the Blochman Banking Company, that claimed the stock as pledgee. And there is no evidence that title revested in Blochman through the execution by the California company of any document of any kind for the purpose of carrying out the "purpose and spirit" of the rescinding resolution. There was no deed, bill of sale, assignment, or other mode of transfer to Blochman, or to any of his associates. Unless, therefore, the purported rescission of June 27, 1911, *ipso facto* operated to retransfer the title to Blochman, there is no basis for an accounting or for any claim of damages based upon the theory that, solely by reason of the transaction of June 27, 1911, Blochman and his codefendants Smith, Lea, and the Arizona company became vested with title to property that rightfully belongs to the California company. Therefore, assuming that, by the transaction of June 27, 1911, there was a mutual rescission of the contract of exchange as actually made on July 3, 1906, the question that presents itself is: Did that rescission, *ipso facto,* effect a retransfer of title to Blochman?

Where, for any reason, the title of a vendee has not been perfected, or where the contract, in any respect, remains executory, the idea of a rescission is quite appropriate; for rescission is nothing more nor less than the unmaking of a contract. [11] But if a contract of sale or of exchange has been fully executed, and nothing remains to be done thereunder by either party thereto, the contract has fulfilled its purpose, and merely rescinding it by the mutual consent of the parties, i. e., unmaking it by mutual consent, will not alone and *ipso facto,* in the absence of an intent to effect a restoration of title solely by reason of the rescission, restore to either of the parties that which he may have parted with under the fully executed contract. Of

course, if the sale or exchange is legally rescinded by the judgment of a judicial tribunal on account of fraud, mistake, undue influence, etc., the whole sale or exchange thereby becomes nullified *ab initio;* and in that case the property sold or exchanged is considered as never having been changed. But when the sale or exchange is honestly and fairly made and perfected by a transfer of the title, so that the property in the article sold or exchanged is completely changed, an agreement of the parties thereafter made to rescind the contract, or to give up the bargain, as it often is expressed, amounts to no more than an executory agreement to resell or re-exchange, unless it shall appear that it was the intention of the parties that the rescission alone should operate as a completely executed contract of resale or of re-exchange. If such intention does not appear, then whatever was necessary in the first instance to constitute the original sale or exchange a legal transfer of the property, is equally necessary to effect the resale or re-exchange. In short, whether the mutual rescission of the original contract of sale or contract of exchange *ipso facto* effects a resale or re-exchange, depends, in the last analysis, upon the intention of the parties. For, unless a contrary intent appear, the mutual rescission of a fully executed contract of sale is but the equivalent of an independent agreement by the buyer to reconvey the property, and a similar independent agreement by the seller to repay whatever money may have been paid him, and title will not revest in the seller until the buyer has made a reconveyance or a redelivery with whatever formalities were necessary to pass the title in the first instance. If, therefore, from the language used by the parties to the rescinding resolution of June 27, 1911, read in the light of all the attendant circumstances, it appears that it was their intention that further formalities should be had in order to effect a re-exchange, the property did not *ipso facto* repass upon the making of the rescission agreement, but, to accomplish that result, the further formalities contemplated by the parties were necessary. (*Quincy* v. *Tilton,* 5 Me. 277; *Blanchard* v. *Trim,* 38 N. Y. 225; *Hornberger* v. *Feder,* 30 Misc. Rep. 121, [61 N. Y. Supp. 865]; *Klein* v. *Rector,* 57 Miss. 538; *Miller* v. *Smith,* 1 Mason, 437, [Fed. Cas. No. 9590]; *Folsom* v. *Cornell,* 150 Mass. 118, [22 N. E. 705]; 35 Cyc.

129.) In *Quincy* v. *Tilton, supra,* the court stated the rule as follows: " . . . when the sale or exchange is fairly and honestly made and perfected by delivery, the property is completely changed in the articles which are the subject of the sale or exchange; and if, after this, the parties agree to give up the bargain, as it is often expressed, and place things as they stood before it was made, this object can only be effected by what, in legal contemplation, amounts to a resale or re-exchange; and whatever was necessary to constitute the original sale or exchange a legal transfer of the property from one of the parties to the other is equally necessary to constitute a legal resale or re-exchange." [12] The provision in the resolution of the California company's board of directors authorizing the officers of the corporation to execute and deliver all necessary documents to carry out the spirit and purpose of the resolution evidences an intention that something further was to be done to effect a retransfer of the title.

Moreover, even if we assume that the transaction of June 27, 1911, was an attempted "rescission" of the contract of exchange as actually made on July 3, 1906, still that transaction was something more than a mere "rescission." A "rescission," and no more, would have restored each party to the *status quo.* But Blochman accompanied his notice of rescission with an alternative proposal, under which he was to receive more than a mere return of the shares of the Mexican company. This alternative proposal was accepted by the California company's board of directors in the board's resolution of June 27, 1911. By this acceptance of Blochman's alternative proposal there was created, not an agreement for the restoration of the *status quo,* but an executory agreement—an executory agreement whereby each party agreed to convey certain things to the other. It appears from the terms of Blochman's alternative proposal and the board resolution of acceptance that it was the intention of the parties that title should not pass as to any of the several articles or things mentioned in the alternative proposal until each had done what he or it had undertaken to do. For example, by its acceptance of Blochman's alternative proposal, the California company agreed to pay the former five thousand dollars, and Blochman agreed to release all claim to certain of the shares of the California

company's capital stock, and keep the balance. This was an executory agreement. It never did become an executed contract of sale or of exchange. It was not intended that there should be an executed contract of sale or exchange until the appropriate officers of the California company should do what the resolution authorized them to do, namely, execute and deliver "all the necessary documents of every kind, nature, and description to carry out the purpose and spirit of this resolution."

For these reasons we think that whatever title to the one hundred shares may have passed to the California company under the exchange contract of July 3, 1906, still remains in that company, and that it has not been divested of any title by the rescinding resolution of June 27, 1911.

This being the situation, there is no basis for an accounting or for any claim of damages as against the defendants Smith, Lea, Blochman, and the Arizona company; and since the evidence and defendants' pleadings show that Smith, Lea, and Blochman make no claim to the stock, the judgment, as to them, should be affirmed.

[13] We think, however, that there are averments in the complaint sufficient to entitle plaintiffs, on behalf of the California company, to invoke the jurisdiction of a court of equity to compel the Mexican company so to register the shares upon its books as that their registration shall show correctly the nature and extent of whatever title thereto, if any, the California company may possess. In their prayer for relief, plaintiffs not only pray for general relief but specifically ask that the shares of the Mexican company's capital stock be transferred to the California company on the books of the Mexican company. Where, as in this case, there is an answer to the complaint, the court may grant the plaintiff any relief consistent with the case made by the complaint and embraced within the issues. (Code Civ. Proc., sec. 580.) For the purpose of such relief the Arizona company is a proper, if not a necessary, party defendant; and for that reason it was error to grant its motion for a nonsuit.

[14] It is an established doctrine of equity jurisprudence that the true owner of stock may resort to a court of equity to compel the corporation to register on the books a transfer of the stock and to issue to him a new certifi-

cate; for it is the owner's right to cause the corporation's books to show truthfully the real title or claim of each and every person having any lawful interest in the stock. In such an action it is proper to bring before the court as parties to the suit all persons having an interest in the stock, whether legal or equitable, in order that they may be bound by the decree and further litigation prevented. (*Howard* v. *Corey,* 126 Ala. 283, [28 South. 682]; *Thorton* v. *Martin,* 116 Ga. 115, [42 S. E. 348].) Here, the California company (a claimant of the stock on whose behalf the action is prosecuted), the Arizona company (also a claimant of the stock), and the Mexican company (the corporation that is to be compelled to enter a registration that will truthfully set forth the ownership of the stock and of every lawful interest therein) are necessary parties to any determination of the question of title to the one hundred shares of the Mexican company's capital stock. **[15]** Moreover, it would seem that the presence of the Blochman Banking Company, as claimant of a pledgee's special property, is necessary to a complete determination of the controversy, and that, therefore, the court, *sua sponte,* should make an order under section 389 of the Code of Civil Procedure directing the bank to be brought into the action as a party defendant.

From the foregoing it follows that the case should be remanded for a retrial upon the single issue of title to the one hundred shares of the capital stock of the Mexican company, and the latter company directed so to register the shares that its books shall correctly show the ownership; and, if it be found that more than one person or corporation is interested in the stock, that the company's books shall be made to show correctly the several interests of all rival claimants.

As to Blochman, Smith, and Lea, each of the judgments appealed from is affirmed. As to defendants New Pedrara Onyx Company (the Mexican company) and New Pedrara Mexican Onyx Company (the California company), the judgment in case No. 3011—the judgment of February 4, 1916—is reversed, and, as to them, the cause is remanded for a retrial of the issues respecting the ownership and proper registration of the one hundred shares. As to the defendant Pedrara Onyx Company (the Arizona company),

the judgment in case No. 3053—the judgment of nonsuit—is reversed, and, as to that defendant, the cause is remanded for a retrial of the issues respecting the ownership and proper registration of the one hundred shares.

Thomas, J., and Weller, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 28, 1920.

All the Justices concurred.